(No. 18922.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSEPH PIECH, Plaintiff in Error.

*Opinion filed December 20, 1928.*

FRANK A. McDONNELL, (ELWYN E. LONG, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and ROY D. JOHNSON, (EDWARD E. WILSON, and JOHN HOLMAN, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Joseph Piech has sued out this writ of error to review a judgment of the criminal court of Cook county convicting him of robbery.

The indictment, which was returned on May 20, 1927, consists of a single count, and charges that Garfield Sullivan, John Gavin, John Piech, Joe Piech and John Murray, being armed with a pistol, robbed Fred E. Rogers of $6840, the property of the Brinks Express Company. The robbery was committed by Sullivan, Gavin and John Piech, three convicts who had become acquainted at the reformatory at Pontiac while serving sentences of conviction for felonies. Gavin and John Piech had escaped from the reformatory, and Sullivan, who was twenty-seven years old and had been in prison since 1919 upon a conviction of robbery, was paroled on January 13, 1927. He immediately violated his parole by associating with Gavin and John Piech, and on

February 3, 1927, three weeks after his release on parole, the three perpetrated the robbery which is now the subject of consideration. The record shows that the plaintiff in error and Murray each made a motion for a separate trial, which was overruled, and they were put on trial together and were convicted, their ages being found to be, respectively, thirty-four and forty-four years. The record does not show what disposition was made of the case against the other defendants, but Sullivan testified for the People on the trial of their co-defendants, the plaintiff in error and Murray.

The plaintiff in error was in the military service overseas in the World War, was in bad health and lived with his wife in a rooming house conducted by her in Chicago. He testified that for five years his business had been running a miniature brewery, and that before he went into the manufacture of beer he was hauling beer from outside of Cook county for himself from 1920 to 1923. Before that time he had been sick for nearly a year, after his discharge from military service, in the government hospital on Drexel boulevard. Murray was employed as an orderly at the Michael Reese Hospital and had a room which he occupied in the rooming house kept by the wife of the plaintiff in error. The robbery occurred at the Michael Reese Hospital about three o'clock in the afternoon while Fred Rogers, who was an employee of the Brinks Express Company, was paying the pay-roll of the hospital. He was accompanied by James Garten as a guard and George Vivian as chauffeur. While so engaged, Sullivan, Gavin and John Piech, armed with a sawed-off shot-gun and two revolvers, entered the hospital and by force and intimidation took over $6000 which Rogers had in his possession, from him and escaped. The circumstances of the robbery were detailed by Rogers, Vivian and Garten and the robbers were fully identified.

Neither the plaintiff in error nor Murray was mentioned by any witness for the prosecution except Sullivan, who

was the first witness called on behalf of the People, and Lieutenant O'Connor, whose testimony will be referred to later. Sullivan testified to the commission of the crime and connected Joe Piech and Murray with it. He testified that he had no acquaintance with either the plaintiff in error or Murray before his return to Chicago on being paroled from the reformatory, but that more than a week after his return he went with Gavin and John Piech to the home of the plaintiff in error, where John Piech introduced him to his brother, the plaintiff in error, saying, "This is the fellow that is hot," and that he also then met Murray, who was rooming there. He next visited Piech's house three or four days later and had a conversation with him about the Michael Reese Hospital. The plaintiff in error said he had a man planted there who would take care of it for them and "in a few days before the third of February I will take you over to look the place over." Sullivan also testified that two days prior to the hold-up Joe Piech took him to the Michael Reese Hospital and they met Murray. Sullivan went into the hospital with Murray and Piech walked away. At that time Gavin and John Piech were at Joe Piech's home. When Sullivan went into the hospital they stayed there a few minutes. Murray took him down-stairs and they looked over the place. Murray took him through the basement and showed him the room where the paymaster would pay, and wanted to show him the way to get out of the place. They were there not over ten minutes, and Murray walked out with Sullivan and left him at the entrance to the hospital. Sullivan went back to the Piech house, where Joe Piech, John Piech and Gavin were. Sullivan told Joe Piech how it looked, and told him it was all set and the way they were coming out. Joe said it was O. K. and left it up to Sullivan's judgment. They had a conversation about guns at Joe's house. Sullivan, John Piech and Gavin told Joe Piech they had one shot-gun and revolver and they needed another revolver. Joe said he would get it for them.

Sullivan further testified that the next time he saw Joe Piech was the day of the hold-up, about twenty minutes to three. He saw Murray there, too. He was in bed when Sullivan saw him. He had a conversation with Joe Piech before he went over to hold up the Michael Reese Hospital. Joe told him to take their car and put it in back of Joe's garage, and he would go up-stairs and get Murray and have him go over to the hospital right away, and that as soon as they made the hold-up they should come right back and that Sullivan should drop off there with the money. Gavin and John Piech rode with him from Joe Piech's home to the Michael Reese Hospital, where they arrived at about five minutes to three. Prior to going to the hospital, at Joe Piech's house Joe gave Sullivan a loaded revolver. After getting the money, Sullivan, Gavin and John Piech got in the car and drove to Joe's house. Sullivan testified that when he went by the house he saw Joe, and when Joe saw him he dropped the curtain. Nothing was said about dropping the curtain before. They drove away from there and went over to Joe's mother's house. Sullivan went in alone, in the alley. In about twenty minutes Gavin and John Piech came in. After they got there they opened the envelopes and started putting the money together. He saw Joe Piech about an hour after the hold-up. Sullivan was arrested in April and was taken to the police station. He testified that about twelve or one o'clock that night he saw Joe Piech and had a conversation with him. Joe told him to keep his mouth shut and he would be out in the morning. They were talking in Lieutenant O'Connor's office, and Sullivan told Joe he was going to jump out the window, and Joe said, "Don't; you are going out on a bond to-morrow morning; you don't have to do that." He showed Sullivan a roll of bills.

William E. O'Connor testified that he knew Joe Piech. He saw him during the month of April, when he was lieutenant, at the police station. Witness came to work at

11:30 P. M. and saw Piech in the station. He came in that evening. He came up and said he wanted to see a man named Sullivan, and he had a bottle of coffee and some sandwiches.

Joe Piech testified that he never knew Sullivan and denied specifically every detail of his testimony, saying that he never met Sullivan until he came into the court room at the trial; that he knew O'Connor and heard him testify, but he did not see him on the morning or the midnight of the day he testified to and never brought coffee or anything to Sullivan.

Dr. Anthony Winfield Summers, who was chief surgeon of the Omaha Packing Company, testified that his morning hours were occupied by his duties to the packing company, but he maintained an office and kept office hours from two to four o'clock in the afternoon of every week day and from ten to twelve o'clock Sunday forenoon, which he devoted to private practice. He testified that he knew the plaintiff in error as a patient, and that from the records of his office he knew that he treated him as a patient in his office in January and February, 1927. Piech was in his office from January 12 daily, between two and four o'clock in the afternoon, until January 30, and received treatment. His physical condition was very poor. He could not drive an automobile. The treatments were painful, and after them the patient was not immediately able to leave the office and the doctor usually had him lie on the table for a while—an average of ten or twenty minutes. He would be in pain for some time afterward. After January 30 he visited the doctor's office and received treatment on February 1, 3 and 5 and at various intervals to February 25, which was the date of the last visit. The visit on February 3 was some time between the hours of two and four. Sullivan's testimony is that he saw the plaintiff in error at his home at twenty minutes before three and immediately after the robbery at five minutes after three, and about an hour later

at the home of his mother. The doctor's testimony, while tending to discredit Sullivan's, is not absolutely inconsistent with it, for it does not exclude the possibility that the plaintiff in error may have gone to the doctor's office and received treatment there at two o'clock and returned to his house before Sullivan's arrival there at twenty minutes before three, or may have gone to the doctor's office after Sullivan claims to have seen him after the robbery, received treatment and then gone to his mother's house within the time stated by Sullivan.

The only evidence tending to connect the plaintiff in error or Murray with the crime is the testimony of Sullivan, according to which they participated in the planning of the robbery and shared in the proceeds, and Sullivan was their accomplice. Their conviction rests upon his uncorroborated testimony. The only part of his testimony in connection with the plaintiff in error in which he is corroborated is his statement that after his arrest the plaintiff in error visited him in the police station. Lieutenant O'Connor testified that the plaintiff in error did come to the station, said he wanted to see a man named Sullivan, and had a bottle of coffee and some sandwiches. This visit, of itself, had no tendency to connect the plaintiff in error with the crime, but if it occurred it did tend to show his previous acquaintance with Sullivan and to contradict his denial of such acquaintance. While, as a matter of law, the testimony of an accomplice must be received with suspicion and acted on with great caution, it is competent evidence, and a conviction of crime may be sustained on the uncorroborated testimony of an accomplice if it is of such a character as to convince the jury, beyond a reasonable doubt, of the guilt of the accused. Sullivan, though the chief actor in the robbery, was not put on trial with Piech and Murray but was permitted to become a witness for the People, and it is manifest that he testified under the expectation that, as he expressed it, he would be "taken care of," as had been

his experience in the Downer's Grove bank robbery case, in which he went on the stand and testified, and after he got through "got three to twenty instead of ten to life." He was a hardened criminal, who testified that in the three months after he was paroled from the reformatory he had committed fourteen or more felonies—"gun robberies, larcenies of automobiles." All these facts were matters going to the question of his credibility as a witness, of which the jurors are the sole judges. On the other hand, the plaintiff in error was himself a criminal, whose occupation had for eight years been a succession of crimes in violation of State and Federal laws, and who refused to testify in regard to the location of his business for fear he might incriminate himself and "the United States might be after" him. In contradiction of Lieutenant O'Connor's testimony he testified that he had not called at the police station with coffee and sandwiches to see Sullivan. The credibility of these witnesses was for the jury, who saw and heard them, and it cannot be said that they acted unreasonably or from prejudice or passion in arriving at their verdict of guilty or that there is clearly a reasonable doubt of the plaintiff in error's guilt.

It is argued that the court erred in instructing the jury that a defendant may be convicted upon the uncorroborated evidence of an accomplice; that such testimony, like all other evidence in the case, is for the jury to pass upon, and that if the jury believed from the evidence in the case that the testimony of Garfield Sullivan was true they could act upon it as true. The criticism of this instruction is that it eliminated the requirement of proof beyond a reasonable doubt by merely requiring the jury to believe the testimony to be true without the additional requirement that they should believe beyond a reasonable doubt, and without expressly bringing to the jury's attention the rule of law that the testimony of a confessed accomplice is subject to grave suspicion and should be acted upon with great cau-

tion. The instruction did not direct a verdict and did not state all the law in relation to the consideration of the testimony of accomplices. It was not, however, misleading. It stated the rule of law correctly, and the rights of the plaintiff in error with reference to Sullivan's testimony were carefully and fully protected by instructions given at the request of the defendants, which informed the jury that "the testimony of an accomplice is liable to grave suspicions, and you should always act upon such testimony with great care and caution, and subject it to careful examination in the light of all the other evidence in the case; and you should consider the influence under which such testimony is given, if any, and whether the purpose of the witness is to shield himself from punishment, to obtain some benefit for himself, or to gratify his malice, and the jury ought not to convict upon such testimony alone, unless after a careful examination of such testimony, in the light of other evidence in the case, they are satisfied beyond a reasonable doubt of its truth, and that they can safely rely upon it." The instruction is the same as that given in *People* v. *McGuirk,* 312 Ill. 257, and *People* v. *Frankenberg,* 236 id. 408. In those cases the same objections were made as here but were held not to be well taken. In the case of *People* v. *Andreanos,* 323 Ill. 34, the instruction was not in regard to the evidence of an accomplice but singled out the complaining witness and victim of the crime in a case of conflicting evidence, and told the jury that if they believed her testimony was clear and convincing and such as convinced the jury beyond a reasonable doubt of the defendant's guilt, the defendant might be convicted of the crime on her uncorroborated testimony. No cautionary instruction was given, and the court held it was erroneous, in a case where the evidence is conflicting and more than one witness testified for the People, to single out the testimony of one of such witnesses as the basis of a verdict of guilty. That decision is not applicable to the circumstances of this case, in which

the jury were fully instructed as to the suspicion with which the testimony of the witness should be received and the caution with which it should be acted upon.

Sullivan's testimony, if true, established the participation of Joe Piech and Murray in the crime as fellow-conspirators and accessories. He testified to his visit to the hospital with Murray and examination of the location of the room in which the paymaster would pay and of the entrances and exits and to the information Murray gave him, and the court sustained the objection of the plaintiff in error because he was not present, allowing the testimony to be received as to Murray. The plaintiff in error requested an instruction that any evidence which the court instructed the jury to regard as evidence merely against one of the defendants and not against another should not be regarded by the jury in its deliberation as evidence against the defendant with reference to whom the court ruled the evidence to be incompetent. The error of the court was not in refusing the instruction but was in excluding the testimony against Piech. Sullivan's testimony tended to show a conspiracy among the five defendants to commit the crime, and, if true, established such conspiracy. In a prosecution of several persons for crime, if the People's evidence shows a conspiracy to commit the crime, the acts and conversations of any of the defendants in carrying out the conspiracy are competent against all. (*People* v. *Covitz,* 262 Ill. 514.) The testimony was competent against the plaintiff in error, and it was therefore not error to refuse to direct the jury to disregard it.

The judgment is affirmed.          *Judgment affirmed.*