(No. 21457.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MAX LEVY, Plaintiff in Error.

*Opinion filed December 23, 1932—Rehearing denied Feb. 8, 1933.*

W. B. STEINBERG, (CLYDE C. FISHER, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

An indictment consisting of two counts, the first charging larceny and the second receiving stolen property was returned in the criminal court of Cook county against Wilma Harjes, Max Levy, Ernest Levy, Dave Blumenfeld and Sadie Weingarten. Wilma Harjes pleaded guilty and with respect to Sadie Weingarten a *nolle prosequi* was entered. The remaining defendants were jointly tried, and, so far as Max Levy is concerned, the jury found him guilty of larceny and fixed the value of the property stolen at $85,000. Motions for a new trial and in arrest of judgment, made in Max Levy's behalf, were overruled, judgment and sentence to the penitentiary followed, and he prosecutes this writ of error for a review of the record.

Lawrence F. Stern and Helen Stern, his wife, on August 31, 1931, resided in the village of Glencoe, in Cook county. During the afternoon of that day they were absent from their home and it was left in charge of their servants. About six o'clock, shortly after their return, Wilma Harjes, Mrs. Stern's personal maid, reported to Mr. Stern that certain silks in his wife's dressing room had been disarranged. Mr. and Mrs. Stern immediately searched the room and discovered that a pearl necklace, three diamond bracelets, a diamond wrist watch, a diamond pin, a diamond wedding ring, a sapphire guard ring, a ruby and diamond ring and a locket and chain were missing. The value of the necklace was $85,000 and of the other jewels,

together, $15,650. Wilma Harjes had been Mrs. Stern's personal maid for fifteen months and during the last three months of that period, the former had gained the acquaintance and was often seen in the company of Ernest Levy, an entertainer at a place of amusement in Chicago. The loss of the jewels was promptly reported to the police department of the village and investigations by the police followed. In these investigations, primary attention was given to the acts and conduct of Wilma Harjes and Ernest Levy. About two weeks after the disappearance of the jewels, Miss Harjes severed her employment by Mrs. Stern, asserting as her reason for doing so, that she was continually harassed by police officers.

Wilma Harjes confessed her guilt and implicated the persons indicted with her in the theft of the jewels. She was the principal witness for the prosecution. She first met the plaintiff in error in the lobby of the Hotel Sherman, in Chicago, about three or four weeks prior to August 31, 1931, when he produced a diamond ring and asked her to pawn it for $300. She succeeded in pledging the ring for only two-thirds of that sum. She again met Ernest Levy and the plaintiff in error, who are brothers, on the evening of August 30, 1931, at the Hotel Metropole, in Chicago. The plaintiff in error had theretofore proposed a plan for the theft of the jewels and to assure her understanding of the part she was to take in its consummation, Ernest Levy reviewed it with her. The three persons remained at the hotel about two hours, after which Ernest Levy drove his brother to the latter's home and Miss Harjes to an interurban railway station where she boarded a train bound for Glencoe. Carrying out the plan agreed upon, Ernest Levy, at three o'clock in the afternoon of the next day, inquired of Miss Harjes by telephone whether conditions at the home of Mr. and Mrs. Stern were favorable to the taking of the jewels and the answer was in the affirmative. Forty-five minutes later, Miss Harjes collected the jewels and wrapped

them in a handkerchief. She then took a flower basket to the garden, pretended to pick some flowers, and proceeded to the servants' entrance to the grounds. At this entrance, she delivered the jewels concealed in the handkerchief to a man who was later identified as Dave Blumenfeld. The man departed, Miss Harjes returned to the house and took to Mrs. Stern's dressing room some silks which had been washed and ironed earlier in the day. The silks were placed in disorder and confusion so that their appearance might lead to inquiry and investigation.

Shortly after the jewels were taken, Miss Harjes successively met Ernest Levy at a theater in Chicago, at the Hotel Metropole, and at Lake Marie near Antioch, in Lake county. At Lake Marie she told Ernest Levy, in the presence of the plaintiff in error and Dave Blumenfeld, that she had informed one Mr. VanBuren, a representative of the company which had insured the jewels, of the larceny and the persons implicated in it; that she had promised him to return the jewels within a specified time, and that, if not permitted to do so, she would make a complete confession of the crime. The plaintiff in error answered that if she listened to other persons she certainly would be arrested, prosecuted and convicted. Sadie Weingarten, a sister of Ernest Levy's wife, was also present at Lake Marie. The plaintiff in error, his brother Ernest, Blumenfeld, Sadie Weingarten and Miss Harjes returned to Chicago together. On this trip the plaintiff in error told Miss Harjes that if she would listen to him, trouble would be avoided and each of them would be satisfied with the money he or she received. He further related that seven years before he had participated in the robbery of the Palmer House with impunity and that "surely he could get away with this robbery also." The party, except the plaintiff in error, proceeded from Chicago, to Gary, Indiana. After making inquiries, Ernest Levy rented a small apartment in that city for himself and Miss Harjes. They registered as Mr. and Mrs.

Loeb and lived there three and one-half weeks as husband and wife.

On several occasions during the period of their residence in Gary, Ernest Levy and Wilma Harjes discussed the question of the disposition of the stolen jewels with Blumenfeld, Sadie Weingarten and the plaintiff in error. At one of these conferences, the date of which does not appear, the plaintiff in error stated that, in all probability, he would effect a sale of all the jewels not later than the succeeding Monday and, in that event, Miss Harjes, to avoid arrest, could depart immediately for Germany. On that Monday, the same question was again discussed and the plaintiff in error remarked that the jewels could be sold in New York City and that he and Blumenfeld should go there by airplane for that purpose. The trip was made and upon their return the following Saturday, Blumenfeld reported that they had received $9100 as the proceeds of the sale of the pearl necklace and two of the other jewels. Out of the proceeds, Miss Harjes received $2200 and Ernest Levy about $1200, and the plaintiff in error and Blumenfeld retained approximately $1800 and $1600 as their respective shares. A small sum was appropriated to defray the living expenses of Ernest Levy and Miss Harjes at Gary. Other disbursements were made; and the questions whether Sadie Weingarten and the person who drove the automobile to the home of Mr. and Mrs. Stern when the theft was committed, should participate in the distribution, were considered. The plaintiff in error insisted that neither should share in the proceeds of the theft. Ernest Levy asked what disposition would be made of the remaining jewels which had been pawned in Chicago. The plaintiff in error answered that he would redeem and sell them and that the proceeds would be divided in a few days.

Subsequently, on November 3, 1931, Wilma Harjes went to Chicago to obtain possession of certain wearing apparel which she had left in a convent in September. Her

demand for the return of the clothing had been refused, and she sought the assistance of an attorney to recover her property. As she left the building in which the latter's office was located, she was arrested and taken to the office of the State's attorney of Cook county. She was there interrogated concerning the theft of Mrs. Stern's jewels. From this office she was driven back to Gary accompanied by Leo Carr and Algot G. Goranson, two police officers and William Knowles, a Pinkerton detective. When they arrived at the building in which she resided, they met Ernest . Levy. He was arrested and taken to the police station in Gary. Officers Carr and Goranson and Wilma Harjes then entered her apartment. In making a search of the premises the officers found $2100 in money between sheets of paper in a suitcase. The money consisted of three bills, one of the denomination of one hundred and two of one thousand dollars.

While the officers were in the apartment, Blumenfeld telephoned Miss Harjes from Chicago that he had sold the remaining jewels for $1500 and that he, the plaintiff in error and Sadie Weingarten would reach Gary in two hours. They arrived about 9:30 P. M. The officers in the meantime had secreted themselves in a clothes closet. Upon entering the apartment, the plaintiff in error asked the whereabouts of his brother Ernest and Miss Harjes answered that he had gone for a ride but would return shortly. Officer Carr was acquainted with the plaintiff in error and recognized his voice. Miss Harjes, obeying the instruction of the officers, addressed her callers in a loud voice stating that the plan proposed by the plaintiff in error for the commission of the crime had not proved to be a good one; that she would not have become involved in it if an earlier suggestion that Mrs. Stern's jewels be forcibly taken had been followed; that she had consulted a lawyer who advised her that she would be unable to secure a passport; that the police were looking for her and that it appeared she would

be sent to jail. Blumenfeld cautioned her not to speak so loudly and the plaintiff in error spoke to her in German which the police officers did not understand. At this point the officers emerged from the closet and arrested Blumenfeld, Sadie Weingarten and the plaintiff in error. These three persons, as well as Miss Harjes and Ernest Levy, signed waivers of extradition and returned to Chicago with the police officers. Each of the three men taken into custody denied any participation in the theft of Mrs. Stern's jewels. The plaintiff in error, however, admitted that shortly before he had gone to New York by airplane. Two diamond bracelets and a diamond wedding ring valued respectively at $3800, $1250 and $275 and a gold wedding ring were recovered by VanBuren, the insurance adjuster, and returned to Mrs. Stern before Christmas.

The plaintiff in error not only denied that he was concerned in the commission of the crime, but he also insisted that he received no share of the proceeds derived from the sale of the jewels. He admitted that he had gone to Gary with Blumenfeld and Sadie Weingarten; that he had visited his brother Ernest and Miss Harjes in that city several times, but he asserted that the purpose of his visits was to induce his brother to return to his wife and children in Chicago. He denied acquaintance with Miss Harjes before he met her in Gary, and he testified that, while he went to New York with Blumenfeld, the trip was made in the course of his business to sell imported French novelties and not to dispose of stolen jewels.

Blumenfeld testified that the purpose of the visits to Gary, made by himself, Sadie Weingarten and the plaintiff in error, was to induce Ernest Levy to return to his wife. He admitted that he accompanied the plaintiff in error to New York, but declared that his sole object in making the trip was to visit his sister who resided in that city. The pertinent testimony of Ernest Levy is that, while he was living with Wilma Harjes in the apartment at Gary, the plain-

tiff in error telephoned him that he should return immediately to his wife and children in Chicago, and that when he told Miss Harjes that he was going back to his family, she objected and threatened to confer with VanBuren, the insurance adjuster. One witness testified that the general reputation of the plaintiff in error in the city of his residence for honesty and as a law-abiding citizen was good. On rebuttal, five witnesses called by the prosecution testified that his reputation respecting his honesty and integrity was bad.

The principal contention for a reversal of the judgment is that the offense of larceny had been completed before any knowledge by the plaintiff in error of the theft of the jewels by competent evidence appeared, and that if the evidence shows he committed an offense, the jury should have found him guilty of being an accessory after the fact or of receiving stolen property. To support this contention reference is made to an answer by Wilma Harjes on her direct examination, when called as a witness by the prosecution, that "Ernest told me that Max wanted me to be of the impression that he knew nothing about this robbery; that I was not supposed to know that Max knew anything about it; but Ernest told me anyhow, and told me that Max thought out the plan of what I should do." It is argued that this answer was mere hearsay and therefore incompetent, and that, when excluded, there was no evidence to sustain the verdict and judgment finding the plaintiff in error guilty of larceny.

Evidence is admissible to prove a conspiracy to commit the crime with which a defendant is charged although no conspiracy is laid in the indictment; and where a conspiracy is established, every act or declaration of any of the conspirators in furtherance of the common purpose is regarded as the act or declaration of each of them and may be proved against all. (*People* v. *Looney,* 324 Ill. 375; *Spies* v. *People,* 122 id. 1). The plaintiff in error and

Wilma Harjes first met three or four weeks before Mrs. Stern's jewels were stolen. He met her again on the evening of August 30, 1931, at the Hotel Metropole in the presence of his brother Ernest Levy. Before that meeting, the plaintiff in error had suggested a plan for the theft of the jewels and Ernest Levy reviewed it with Miss Harjes at that meeting. At Lake Marie, when, in the presence of the plaintiff in error, she threatened to confess the crime unless the jewels were returned, he remarked that if she gave heed to others, her arrest and conviction would be the result. On the return to Chicago from Lake Marie, he told her that if she followed his advice, there would be no trouble and the distribution of money would be satisfactory to the several persons concerned. In his brother's apartment at Gary, the plaintiff in error stated that he expected to sell the jewels not later than the next Monday. When that day arrived, he suggested their sale in New York. Blumenfeld and the plaintiff in error went to that city, a portion of the jewels were sold and upon their return the plaintiff in error retained $1800 as his share of the proceeds. When inquiry was made concerning the disposition of the remaining jewels, he answered that he would sell them and divide the proceeds within a few days. These facts show that the plaintiff in error was a party to the conspiracy whose object was the theft of Mrs. Stern's jewels and that he had an active part in the common enterprise from its inception to the division and distribution of the proceeds. The statement or declaration by Ernest Levy to Wilma Harjes as repeated in her answer, although made in the absence of the plaintiff in error, was made in furtherance of the common purpose and was therefore competent and provable against him.

The further contention is made that the testimony of Wilma Harjes, upon which the People's case largely rested, is subject to suspicion and should be acted upon with caution. The testimony of an accomplice is competent, but it

is subject to grave suspicion and should be acted upon with great caution. The jury should carefully consider such testimony in the light of all the other evidence in the case and the influence under which the testimony was given, in order to determine whether the purpose of the witness was to shield himself from punishment, to obtain some personal benefit or advantage or to gratify his malice. If, after all the facts and circumstances in evidence are considered, such testimony uncorroborated is of such a character as to prove guilt beyond a reasonable doubt, it will authorize a verdict of guilty. (*People* v. *Lawson,* 345 Ill. 428; *People* v. *Gordon,* 344 id. 422; *People* v. *Rongetti,* 338 id. 56; *People* v. *Elmore,* 318 id. 276; *People* v. *McKinney,* 267 id. 454; *People* v. *Rosenberg,* 267 id. 202). The cross-examination of Wilma Harjes occupies 146 pages of the record and in no material respect was her testimony shown to be false. On the contrary, facts and circumstances in evidence corroborate her testimony. At the request of the defendants, the court instructed the jury that Wilma Harjes had admitted that she stood convicted of the crime of larceny; that the conviction of a witness for a felony was evidence tending to impeach his or her credibility, and that in determining the weight which they should attach to Wilma Harjes' testimony they had the right to take into consideration the fact that she stood convicted of larceny. The safeguards which the law provides against false testimony were invoked for the protection of the plaintiff in error; and a review of the testimony of Wilma Harjes with all the other evidence in the case shows that the jury's verdict was justified.

Complaint is made that the twenty-third instruction, given at the request of the People, was errroneous. After setting forth the second and third sections of the second division of the Criminal Code, the former defining an accessory before the fact and the second providing that he may be punished independently of the principal, the instruc-

tion concluded, "And if the jury find from the evidence, beyond a reasonable doubt, that the defendant Max Levy * * * did aid, abet, assist, advise or encourage the perpetration of the crime, as charged in the indictment, then the jury are justified in finding the defendant guilty." The objection urged is that the instruction should have been limited by such words as "before or at the time of the alleged larceny," so that a verdict finding the plaintiff in error guilty of larceny would not be returned if the jury believed he was only an accessory after the fact. The evidence having shown that the larceny was the result of a conspiracy and that the plaintiff in error aided and abetted the commission of the crime from its inception, the instruction as given to the jury was proper.

The plaintiff in error was represented by the public defender of Cook county and it is urged that because he did not object to the answer by Wilma Harjes that the plaintiff in error proposed the plan for the larceny of Mrs. Stern's jewels, and because that officer did not cross-examine Miss Harjes, the plaintiff in error was improperly defended and, for that reason, the judgment should be reversed and the cause remanded. The objection is without merit. The answer, it has been shown, was competent and an objection to the question which elicited it or a motion to strike the answer would have been of no avail. The three defendants on trial were represented by three attorneys. Miss Harjes had been subjected to a long and thorough cross-examination by two of them with no appreciable advantage to the defendants. A wise discretion, inculcated by ample experience, undoubtedly induced the public defender to refrain from further cross-examination.

The judgment of the criminal court of Cook county is affirmed.

*Judgment affirmed.*