(No. 27923.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HAROLD E. LIVERMORE *et al.,* Plaintiffs in Error.

*Opinion filed March 21, 1945.*

86

MYER H. GLADSTONE, of Chicago, and DIXON, DEVINE, BRACKEN & DIXON, of Dixon, (JOHN P. DEVINE, and ROBERT L. BRACKEN, both of Dixon, of counsel,) for plaintiffs in error.

GEORGE F. BARRETT, Attorney General, (WILLIAM C. WINES, of Chicago, of counsel,) for the People.

Mr. JUSTICE SMITH delivered the opinion of the court:

Plaintiffs in error, Harold E. Livermore, William S. Livermore, Arthur W. McElmuray, George Vasen and S. E. Stewart, were found guilty by a jury, in the circuit court of La Salle county, of the crime of the confidence game. Plaintiffs in error will be referred to in this opinion as defendants. They were sentenced, on the verdict of the jury, to the penitentiary, in accordance with the statute. They have brought the record to this court for review by writ of error.

The indictment consisted of two counts. It was returned on October 18, 1941. Both counts of the indictment charged that the defendants, on January 2, 1939, obtained from Fannie Barber her money and property of the value of $12,000, by means and by use of the confidence game.

The defendants were engaged in the sale of "tung oil lands," in the State of Mississippi, at prices ranging from $150 to $300 per acre. When they would make a sale, they would then enter into a lease contract with the purchaser, under which they agreed to pay rentals at the rate of $18 per acre per year for the first two years, and $21 per acre per year for the second two years, following the date of the contract. They further agreed in these lease contracts to clear the land and plant it to tung nut trees, and cultivate, fertilize, prune and care for the trees, until they reached the age of four years. The trees were supposed to come into bearing at five years of age. The rough land, before it was cleared, was purchased by the defendants at from $4 to $6 per acre.

The theory of the People is that the defendants entered into a conspiracy to defraud the public generally; that the lease contracts were entered into for the purpose of lulling the purchasers into a feeling of security until the Statute of Limitations had run as to any crime committed in the sale of the land; that the defendants would then go to

the purchasers and by false representations and promises, which they had no intention of keeping, induce such purchasers to enter into a new contract by which they would waive the payment of rentals under the lease contracts, in consideration of the promise of the defendants to use the money, which would otherwise be paid as rentals under the lease contracts, for the construction of a tung oil extracting plant or mill. It is claimed that the defendants had no intention of erecting such plant or mill; that the promise to do so was fraudulently made for the purpose of obtaining a release of the rentals under the lease contracts and waivers of the rental after the statutory limitation had run against any offense connected with the original sale.

Otherwise stated, the theory of the People is that the plan contemplated the sale of the tung oil lands at enormous prices and upon false representations as to their value; that they would keep the purchasers satisfied by paying them a rental equal to six per cent on their investments for the first two years and seven per cent for the third and fourth years, and, thereafter, by false statements and representations, would "trade" the purchasers out of their lease contracts. Upon this theory, the People contend that they had a right, in the trial of the cause, to prove such conspiracy, although no conspiracy was charged in the indictment. They further contend that they had a right to offer in evidence any acts of the defendants, or either of them, tending to show such conspiracy; that the transactions were criminal in their inception and culminated in the obtaining from Fannie Barber, the victim named in the indictment, her property, namely: her right to receive rentals under her lease contracts, by means and by use of the confidence game, in violation of the statute.

In support of this theory, the People called as a witness one Ray Gladden. He was examined before any proof

was offered tending to show the commission of the crime charged in the indictment against Fannie Barber. From his testimony it appears that prior to June 8, 1937, he was an inmate in the Iowa State Penitentiary; that he had been convicted many times, under various aliases, of forgery and other crimes. According to his testimony, he became acquainted with the defendant Vasen while Gladden was still in the penitentiary at Ft. Madison, Iowa. The record does not show whether Vasen himself was an inmate, or whether he merely visited Gladden at the penitentiary. He had some correspondence with Vasen before his release.

Gladden was released at midnight on June 8, 1937. According to prearrangement, he met the defendant Vasen within twenty minutes after he was discharged. Vasen accompanied him to Chicago. According to Gladden's testimony, Vasen outlined to him a plan of operations envisioning the sale of tung oil lands. The plan, as outlined by Vasen and as testified to by Gladden, was that the defendants would ingratiate themselves into the confidence of many people who were friends of each other, in La Salle and adjoining counties, with a view to selling them tung oil lands. The plan contemplated obtaining the confidence of numerous victims; that by obtaining the confidence of one victim, they would, through such victim, gain the confidence of other intended victims; that this confidence would be obtained by the representation that Vasen was unusually successful in realizing money on bad checks, defaulted bonds, worthless and depreciated stocks and bonds and other securities; that they would first approach the victims and offer to collect for them any bad or defaulted securities which they owned on the representations that Vasen was an adept in realizing money on such securities; that certain photographs of tung oil lands and tung oil groves would be shown to the victims, with the representa-

tion that they were selling them the particular land shown, whereas they would, in fact, be sold other and less desirable lands.

Gladden further testified that in order to place him in a position to assist in carrying out the contemplated scheme, Vasen assisted him in obtaining from the Department of Registration and Education of the State of Illinois, a real-estate broker's license; that this license was obtained upon false certificates of good moral character, made by Dr. Murray, an osteopathic physician, practicing in Sandwich, Illinois, and Millage Sumers, the proprietor of a hotel in Somonauk, Illinois. Such license and certificates were offered in evidence. The certificates of good moral character, upon which the license was secured, signed by Sumers and Dr. Murray, were admittedly false. Gladden further testified that after the license was procured, he was employed by Vasen and, in the vicinities of Somonauk, Sandwich and other communities in La Salle and adjoining counties in the State of Illinois, engaged in the sale of tung oil lands. This proof was offered before any proof was introduced concerning the substantive offense charged in the indictment.

The People are correct in their contention that they had a right to prove a conspiracy to commit the offense charged, although no conspiracy was charged in the indictment. (*People* v. *Payne*, 359 Ill. 246; *People* v. *Levy*, 351 Ill. 110; *People* v. *Piech*, 333 Ill. 293; *People* v. *Looney*, 324 Ill. 375.) It was necessary, however, that the conspiracy sought to be shown culminated in the substantive offense charged in the indictment. That offense was the obtaining of money and property of Fannie Barber, by the confidence game, on January 2, 1939. It is conceded by the People that the property of Fannie Barber, which the defendants were charged with obtaining by the confidence game, was the contractual right to receive the rentals under the lease contracts. Of course, they were

not limited in the proof to the particular date charged in the indictment. They were permitted to prove any date within three years prior to the return of the indictment, which was October 18, 1941. *People* v. *Angelica,* 358 Ill. 621.

Turning to the substantive offense charged in the indictment, it is undisputed that there were three transactions between the defendants, or some of them, and Fannie Barber. The first of the defendants to contact Fannie Barber was McElmuray. Fannie Barber was eighty-seven years of age at the time of the trial. It is shown that McElmuray and Vasen had become acquainted with Dr. Murray in the latter part of 1936. Vasen became acquainted with Dr. Murray by calling on him, ostensibly for professional treatments. They learned that Dr. Murray had some defaulted securities, which Vasen offered to collect for him. He was successful in making the collection, or at least he paid to Dr. Murray the money which he was supposed to have realized on the securities. For this service Vasen made no charge. He later sold some tung oil lands to Dr. Murray.

Vasen was introduced to a man by the name of Knight by Dr. Murray. He collected some defaulted securities for Knight, and later sold him some tung oil land. McElmuray and Vasen also contacted Fannie Barber through Dr. Murray. She was a patient of Dr. Murray. They learned from Mrs. Barber that she had some defaulted securities, which Vasen offered to collect for her. For the purpose of collecting such securities, Vasen took Fannie Barber to Chicago. They were accompanied by Dr. Murray and Dr. Murray's wife. They visited an office in Chicago, where the other parties waited in an outer office while Vasen talked with someone in another room. Vasen finally came out with a check, which he said was received by him in payment for the defaulted securities. He showed the check to Mrs. Barber, and apparently she endorsed it. He then asked them to wait while he took the check to

the bank to ascertain if it was good. He did not return either the check or its proceeds to her. They then went back to Sandwich to Dr. Murray's office. Later Vasen sold her thirty acres of tung oil lands, for which she paid the sum of $9000. The deed for this land was delivered to her. It was dated March 15, 1937. On April 7, 1937, at the request of Vasen, Fannie Barber entered into a lease contract with the American Tung Grove Development Co., Inc., leasing the land to said corporation for a term of four years. By the lease, the lessee agreed to pay $18 per acre per annum for the first two years as rental, and $21 per acre per annum for the remaining two years. This rent was payable monthly. The company further agreed to clear the land and plant it to tung trees and to care for, cultivate and fertilize the same, during the term of the lease. The lease contained a renewal option for an additional term of sixteen years. These are the only transactions she had in which the defendant Vasen was present or took any part.

On June 14, 1937, she purchased an additional ten acres of tung lands through the defendant McElmuray, for which she paid $3000. A like lease contract was entered into as had been theretofore made concerning the thirty acres purchased through Vasen. Vasen was not present and, so far as the record shows, had nothing to do with this transaction. The rentals were paid promptly in accordance with the leases on both tracts, up to January 2, 1939. On January 2, 1939, the defendant McElmuray called on Mrs. Barber at her home. He told her that they were going to build an extracting plant for the purpose of extracting the oil from the nuts. He asked her to help pay for it by releasing the rentals under the lease contracts. At that time a contract was signed by Fannie Barber cancelling the rental payments provided in the lease agreements. In consideration of such cancellation, the de-

velopment company, by the contract, agreed to erect, as soon as possible, a plant or mill for the extraction of oil from tung nuts and to process the nuts grown upon the land. It further provided that in lieu of the rent reserved in the lease contracts, which was cancelled, the entire proceeds from tung oil nuts, marketed from the property of Fannie Barber should be paid to her.

The only other transaction with Fannie Barber was on September 13, 1940. It was with McElmuray. At that time she signed a contract to contribute $400 to the corporation, to be used for fulfilling the obligations, contracts, and maintenance of tung groves for the balance of 1940 and for the year 1941. The contract recites that "$100 has been paid in cash, $100 to be paid in January, 1941, $100 in April, 1941, and $100 in July, 1941." She testified that she paid the full $400.

The undisputed evidence is that Vasen's connection with the corporation and with the other defendants, terminated on November 24, 1937. It, therefore, appears that the last transaction which Vasen had with Fannie Barber was the signing of the lease contract relating to the thirty acres of tung land sold her on March 15, 1937. This lease contract is dated April 7, 1937. This was more than three years before the return of the indictment in this case. There is no proof in the record that Vasen had any dealings or transactions of any kind with Fannie Barber, or with any of the other defendants who did have dealings and transactions with her within three years before the indictment was returned. Neither is there any evidence in the record which tends to show that Vasen was a party to any conspiracy to obtain from Fannie Barber a release of the rentals accruing to her under the lease contracts, by means of the confidence game, or other wrongful or criminal act, within three years before the return of the indictment. He was clearly entitled to have his motion

for directed verdict, offered at the close of the People's evidence, allowed, and a verdict of not guilty directed. The judgment of conviction cannot.be sustained as to him.

All of the testimony of Gladden relating his conversations with Vasen was improper as against the remaining defendants. The testimony of Millage Sumers was of the same character. It related to conversations with Gladden and Vasen and conversations between Gladden and Vasen, which he overheard. It was error to admit the testimony of Gladden and Sumers against the other defendants.

The testimony of Gladden consisted almost wholly of the recital of narrative statements made by Vasen as to what had been done and would be done to swindle the victims. "It is undoubtedly the law, that, after a conspiracy is established, only those declarations of each member, *which are in furtherance of the common design,* can be introduced in evidence against the other members. Declarations, that are merely narrative as to what has been done or will be done, are incompetent and should not be admitted except as against the defendant making them, or in whose presence they are made." *Spies* v. *People,* 122 Ill. 1, 237.

It is true that the People had the right to connect any of the defendants with the substantive crime charged by proving a conspiracy to commit that crime. Under this rule, however, it was incumbent upon the People to show that the crime charged was the result of such conspiracy. In order to render a party liable it must be shown that he was a party to a conspiracy to commit the offense charged in the indictment.

The effect of proof of a conspiracy, where no conspiracy is charged, is no different from the effect of such proof where a conspiracy is charged in the indictment. In *Lowell* v. *People,* 229 Ill. 227, we said: "In Wharton on Criminal Law, (vol. 2, sec. 1396,) after quoting from Tindal, C. J., it is said: 'Where, therefore, the persons injured were de-

fined at the time of the conspiracy and ascertainable by the pleader, their names should be specified in the indictment. Where, however, the conspiracy was to defraud a class not capable of being at the time resolved into individuals, or to defraud the public generally, then the specification of names is impracticable and hence unnecessary. An intent to cheat A as an individual is not sustained by evidence of an intent to cheat the public generally.' In McClain on Criminal Law (vol. 2, sec. 982) it is said: 'Where the charge is of a conspiracy to defraud in general, it is not necessary to specifically allege the name of the person or persons intended to be defrauded. It is enough to charge the intent to defraud persons of a particular class or description. But if the conspiracy charged is to defraud a particular person he should be named, and the proof must correspond to the allegation in this respect. If the charge is of a conspiracy to defraud the public generally, proof of an intent to defraud a particular person will constitute a variance.' "

Here, the most that can be said of the evidence tending to connect Vasen with a conspiracy is that it tends to show that he was a party to a conspiracy to defraud the public generally. Such proof was insufficient to connect him with a conspiracy to obtain from Fannie Barber her right to receive the rents under the lease contracts, by means of the confidence game. There being no evidence connecting Vasen with a conspiracy to commit the crime charged, his acts and conversations were not admissible against the other defendants.

The defendants complain of the action of the court in admitting evidence of other transactions, supposed to be similar to the transaction with Fannie Barber, covered by the indictment. Proof of other similar offenses for the purpose of showing the intent with which the act charged was committed is admissible under the safeguards and within the limits of established rules. "Proof of offenses

similar to the one charged and for which the accused is being tried is not admissible to prove that he committed the act charged but is only to be considered by the jury in determining the intent with which the act charged was done, where the jury are satisfied by the other evidence that the accused committed the act charged. (*People* v. *Hobbs, supra* [297 Ill. 399]; *Baxter* v. *State,* 91 Ohio St. 167, 110 N. E. 456.) Evidence which shows the commission of other offenses should be received with care, and the trial court should make clear to the jury that the evidence is being received for the sole purpose of showing the intent with which the act charged was done. Unless the admission of such evidence is kept within limitations pointed out by the authorities it may result in denying the prisoner that fair and impartial trial guaranteed by the law and may break down those barriers erected by the law and designed for the protection of the innocent. Evidence of the collateral offense should never be received until evidence has been produced which implicates the accused in the charge under trial, and unless sufficient evidence of this has, in the opinion of the trial judge, been first adduced, all evidence of other offenses should be excluded." *People* v. *Folignos,* 322 Ill. 304.

In *People* v. *Novotny,* 305 Ill. 549, it was said: "The first evidence introduced tended to establish the character of the defendant as a dishonest man, who would be willing to commit the crime charged in the indictment, by showing that on two occasions he had been guilty of dishonest conduct in connection with the purchase of Liberty bonds. The court might instruct the jury to disregard the testimony, but such an instruction would not erase from the minds of the jury the fact, which was fixed by the testimony, of the supposed character of the man whom they were trying. It cannot be regarded as a fair trial where the prosecution has been permitted to blacken the

character of the defendant before starting on an investigation of the crime with which he is charged, merely because afterward the jury were instructed that they should not pay any attention to that testimony."

In the more recent case of *People* v. *Chronister,* 379 Ill. 617, we said: "The court also permitted the testimony of the witnesses above mentioned relating to the giving of checks by the defendant after July 30th, the date of the alleged crime. The competency of such evidence in general was thoroughly analyzed by this court in *People* v. *Hobbs,* 297 Ill. 399, where it was said that as a general rule evidence of a subsequent crime without proof of crimes of a like character previous to the offense is not admissible in evidence. The only theory upon which similar offenses are permitted to be proved in cases of this kind is that it tends to show guilty knowledge, as well as a criminal intent before the criminal act, but that proof of offenses subsequent to the alleged crime is contrary to the presumption of innocence, and cannot establish a guilty intent on a prior occasion, in the absence of proof that a defendant had formerly committed a criminal offense. The *Hobbs case* was followed in *People* v. *Moshiek,* 323 Ill. 11, and applied in a forgery transaction. The court said: 'This court in the case of *People* v. *Hobbs,* 297 Ill. 399, has definitely and finally settled the question that the evidence of the commission of subsequent crimes is not admissible for the purpose of proving guilty knowledge or intent in the absence of proof that the defendant has formerly committed a similar offense, and that his first offense must be held to be the beginning of his criminal career, and that his intent in the commission of his first offense may not be presumed from his commission of subsequent similar and distinct offenses.' "

Before evidence of a similar offense committed subsequent to the date of the crime charged is admissible, there

must be evidence in the record showing the commission of a like offense prior to the date of the crime charged. *People* v. *Gotler*, 311 Ill. 387.

On the trial of this case, the People offered in evidence the testimony of Dr. W. N. Avery. Dr. Avery was a physician practicing his profession in Mendota, Illinois. He testified that he bought five acres of tung oil lands in 1937, for which he paid $300 per acre. He also executed a lease contract. He testified that he had been in Mississippi every year for fifteen years and was familiar with the lands. He made three purchases altogether, after he had been to Mississippi and had examined the land. He testified that he found the conditions with reference to the land the same as shown by the films which he had seen. He later became a director in the company. There is no proof that he was dissatisfied with his purchase or that he entered into any contract cancelling the lease contracts. His testimony involved no offense, either similar or dissimilar, to that charged in the indictment. The substance of his testimony was that he made three purchases of land from some of the defendants. It was land with which he was perfectly familiar and which he saw and examined every year.

Bessie Beelman testified that she met Vasen either the last week in October or the first week in November, 1936. A friend had told her that Vasen could get her some money on her bad investments. At that time he told her he thought he could collect the money on them. Later he took one certificate of stock, which she owned, and cashed it at par. She invested the proceeds in tung oil land. In December he cashed another defaulted bond for her, of a par value of $500, which she also invested in tung oil lands. She purchased lands on four different occasions from Vasen, for which she paid $300 per acre. She did not sign a contract releasing the rentals. Her sister, Eva Beelman, testified to the same transactions.

Mabel J. Wolf and George Wolf, her husband, testified to the purchase of lands from the defendant W. S. Livermore. Livermore was accompanied by Reverend Feldwish, their former pastor. They testified that they purchased the land on the recommendation of Reverend Feldwish. They did not sign contracts releasing the rentals.

Harold Dean testified that in April, 1938, William B. Mueller and the defendant McElmuray, showed him some moving pictures of a development in Florida, and attempted to sell him some tung oil land. He declined to purchase at that time. Later he consulted the county judge of La Salle county, who owned considerable lands in the same neighborhood. Upon his advice and recommendation, Dean purchased five acres at $150 per acre. He also executed a lease contract. Later he visited the lands in Mississippi, and thereafter purchased an additional five acres. He was perfectly familiar with the land when he made the second purchase, and was satisfied with it. His only complaint was that Mueller told him he would get a discount of $75 if he bought five acres. He seemed to have been delayed in receiving this discount. He further testified that neither Mueller nor McElmuray had impressed him, and he purchased the land only after talking with Judge Massieon, and relied on what he had told him relative to the lands.

Numerous other transactions were shown by various witnesses, consisting merely of a purchase of land from the defendants, or some of them. Some of the purchasers relied upon statements made by the defendants, and others relied upon the statements of others not connected with the defendants. Some of them purchased on their own judgment after having seen the land. Most of these purchasers had neither signed nor been asked to sign a contract releasing the rental contract. Neither had they had any conversation with either of the defendants regarding the erection of a mill.

Robert Smiley testified to a conversation in Chicago with the defendant Harold Livermore. In that conversation he stated that Livermore had told him they planned to sell land in Mississippi for the development of tung groves; that they planned to sell at $200 under one contract and $120 per acre under another contract. Later on he had another conversation with Livermore when McElmuray was present. They told him they were selling land at $200 per acre and they proposed to put $120 of the sale price in escrow in a bank at Rock Island; this money was to be used for development purposes and was to be withdrawn in four years at the rate of 40 per cent the first year, 25 per cent the second, 20 per cent the third, and 15 per cent the last year. This was followed by the testimony of the vice-president and cashier of the State Bank of Rock Island, who identified records and deposit slips showing an initial deposit of $960. The deposit was made in the name of American Tung Grove Development Co. These records and certain signature cards were admitted in evidence. This evidence had no connection whatever with the offense alleged to have been perpetrated upon Fannie Barber. It was not claimed that any promises were made to her at any time concerning an escrow deposit, or any transaction of that kind.

The People were also permitted to prove numerous other sales of tung oil lands, some of which were made by parties other than the defendants. No element of any crime was shown to have been present in many of such sales. The defendants were not on trial for the sale of tung oil lands—they were charged with obtaining from Fannie Barber her property by means of the confidence game. The admission of such testimony was clearly error.

The rule is that in order for proof of other transactions to be admissible, they must appear to be of the same character and involve the same criminal acts as those charged

in the indictment. *People* v. *Perlmutter*, 306 Ill. 495; *People* v. *Novotny*, 305 Ill. 549.

While the order in which evidence shall be introduced is largely within the discretion of the trial court, the rule is that proof of other alleged similar offenses should not be admitted until proof of the offense charged in the indictment has been made. "Evidence of the collateral offense should never be received until evidence has been produced which implicates the accused in the charge under trial, and unless sufficient evidence of this has, in the opinion of the trial judge, been adduced, all evidence of other offenses should be excluded." *People* v. *Folignos,* 322 Ill. 304.

If proof of other supposed similar transactions is offered in advance of the proof touching the specific crime charged in the indictment, the court must depend upon the promise of the State's Attorney to connect it with the crime charged, so as to render it admissible. In the effort to obtain a conviction in a hotly contested case, such promises, as in this case, do not always materialize. The wisdom of the rule above quoted from the case of *People* v. *Folignos,* is fully demonstrated by the record in this case. Had the court in the trial of this case followed that rule and required the State's Attorney to first offer proof touching the crime charged in the indictment, no doubt the testimony above referred to relating to other transactions would not have been admitted. The testimony of those witnesses in most cases had no relation whatever to a similar offense, and did not even tend to prove any offense. It was wholly inadmissible. Its only effect was to create a courtroom atmosphere unfavorable to the defendants, and to impress upon the jury the implication that they were engaged in large-scale criminal operations. The admission of proof of such other transactions, which in no way involved any criminal conduct similar to that attending the transactions

with Fannie Barber, for which they were on trial, constituted reversible error.

Complaint is also made that the State's Attorney improperly brought to the attention of the jury the fact that other indictments had been returned against the defendants. This objection is based upon an occurrence during the trial, and in the presence of the jury, in which the State's Attorney made the following statment: "We stipulate the Grand Jury convened and returned the indictment which is now on trial along with indictment 42,705 against Harold E. Livermore, William S. Livermore, Arthur W. McElmuray, George Vasen and S. E. Stewart, together with an indictment No. 42,706."

In *People* v. *Hughey,* 382 Ill. 136, we said: "During cross-examination by defendant's counsel he was asked what conversation he had with defendant. He answered, 'Well he came in there and I booked him. We have cards, and he had ten indictments against him. I taken him in the office and made out a card on him, an arrest card.' The answer was immediately disclaimed by defendant's counsel as not responsive, and a motion was made to strike it. The motion was denied on the ground that counsel had asked the witness for further conversations. This was error. The answer was not only not responsive to the question but was highly prejudicial in that it informed the jury that a grand jury had returned other indictments against plaintiff in error—ten of them. Indeed it is doubtful whether the prejudice could have been removed by sustaining the motion to strike and admonishing the jury that it was not to be considered by them. Clearly the prejudicial effect was heightened by the court's refusal of the motion to strike. Proof of other indictments against the accused tends to build in the minds of the jurors the belief that he has been engaged in other acts of misconduct. Such proof was not admissible (*People* v. *King,* 276 Ill. 138; *Addison* v. *People,* 193 id. 405.)

The case was one in which it cannot be said that it should be affirmed notwithstanding the error committed. For this error the judgment is reversed and the cause is remanded for a new trial."

The record shows that this statement of the State's Attorney was deliberately made. It could not have been made for a legitimate purpose and is inexcusable. This improper and uncalled for reference to two other indictments against the defendants constituted reversible error.

Defendants also object to the instructions. Complaint is made of instruction No. 11, given on behalf of the People. That was a stock instruction following the statutory definition of accomplices. There was some evidence in the record tending to show that the crime alleged to have been perpetrated upon Fannie Barber was the result of a conspiracy, or at least of concerted action on the part of the defendants. The court did not err in giving that instruction. The record in this case presents an entirely different situation from that presented in *People* v. *Holtz*, 294 Ill. 143, relied upon by the defendants in support of their objection to this instruction. People's instructions Nos. 12, 13, 14 and 15 are criticized. These instructions were on the subject of conspiracy. The reason, of course, for permitting proof of a conspiracy, where no such conspiracy is charged in the indictment, is to connect the defendants with the crime charged, so that the acts proved against one may be regarded as the acts of all and in furtherance of the conspiracy to commit the crime charged. These instructions merely define what is meant by the term conspiracy and the elements necessary to establish it. We do not think these instructions are subject to the objections made. Instruction No. 16 is said to be erroneous because it was inapplicable to the facts in the case. This objection is based upon the assertion that if any offense was committed in the transactions with Fannie Barber at the times she purchased the tung

oil land in 1937, the offense was complete at the time those transactions were closed, and that they were barred by statutory limitation. While we have held that the transactions between Vasen and Fannie Barber, in March and April, 1937, were barred by the statutory limitation as to him, this holding is based upon the fact that he had no connection with the transaction with Fannie Barber in January, 1939, alleged in the indictment. If the jury believed a conspiracy was shown and that such conspiracy culminated in the crime charged, alleged to have been committed against Fannie Barber in January, 1939, then the statutory limitation would not be applicable for the reason that the crime charged was not consummated until January 2, 1939, when her property was ultimately obtained.

It is also argued that People's instructions 9 and 10, and defendants' instructions 9 and 11, all of which related to the crime of the confidence game, as a substantive crime, are repugnant to the People's instructions 12, 13, 14, 15 and 17, all of which define conspiracy in various terms. We do not regard the two groups of instructions as repugnant. They related to a different subject matter. One group defined the crime of the confidence game as a substantive offense, while the other defined and advised the jury the effect of a conspiracy, if such was shown by the evidence. Objection is made to instruction No. 17, given on behalf of the People. This objection is well taken. The instruction defined the crime of conspiracy. It would have been proper if the charge against the defendants had been under the conspiracy statute. It had no application to the facts in this case and could only tend to mislead the jury into believing that the defendants might be found guilty if it was shown that a conspiracy existed, even though the crime charged in the indictment was not committed in the furtherance of such conspiracy. It erroneously told the jury that the members of a conspiracy "commit the offense when they become partners

to the transaction or knowingly further the plan." Here, the defendants were not charged with the crime of conspiracy, to which this instruction applied. They were charged with the crime of obtaining the money and property of Fannie Barber by the confidence game. Proof of a conspiracy among the defendants was only incidental and admissible for the purpose of connecting them with the offense charged, and making the conduct of one the conduct of all. It was error to give this instruction. Instruction No. 13 told the jury that the charge against the defendants was the substantive crime of obtaining property by means of the confidence game, while instruction No. 15 referred to the charge as one of conspiracy. Instruction No. 15 was confusing and should not have been given.

Much complaint is also made of the conduct of the State's Attorney throughout the trail. The record shows that such criticism is not without some merit. In view of the conclusion we have reached, it is unnecessary to go into this in detail. It cannot be assumed that such conduct will be repeated upon another trial.

For the errors above indicated, we are convinced that the defendants did not have a fair trial. As heretofore pointed out, there was no competent evidence connecting the defendant George Vasen with the crime charged in the indictment. As to him the judgment is reversed and the cause will not be remanded. As to the defendants Harold E. Livermore, William S. Livermore, Arthur W. McElmuray, and S. E. Stewart, the judgment is reversed and the cause is remanded to the circuit court of La Salle county.

*Judgment reversed as to Vasen;*
*reversed and remanded as to Livermore et al.*