(No. 14451.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* THOMAS K. NOVOTNY, Plaintiff in Error.

*Opinion filed December 19, 1922.*

1. CRIMINAL LAW—*when evidence of other offenses is not admissible in a prosecution for confidence game.* It is competent in a prosecution for the confidence game to prove other independent crimes of a similar nature to show guilty knowledge or intention or where the other offenses are a part of a series of transactions culminating in the offense charged, but in a prosecution of a defendant for fraudulently procuring money of a foreigner on the pretext of helping him to avoid induction into military service it is not proper to introduce evidence that the defendant had sold Liberty bonds to other foreigners and misappropriated the money received from such sales.

2. SAME—*when instruction to disregard testimony does not cure error in its admission—argument.* In a prosecution for the confidence game, an instruction for the jury to disregard testimony tending to prove other offenses committed by the defendant having no connection with the crime charged in the indictment does not cure the error in the introduction of such evidence, where the instruction is not likely to erase from the minds of the jury an impression, derived from the incompetent evidence, of the supposed dishonest character of the defendant, particularly where the State's attorney in his argument refers to such evidence for the evident purpose of arousing the prejudice of the jury against the defendant.

3. SAME—*name of party injured by the alleged offense must be stated and proved, if known.* In indictments for offenses against the persons or property of individuals the Christian and surnames of the parties injured must be stated if known, and the name stated must be either the real name or that by which the party is usually known and must be proved as laid.

4. SAME—*when allegation in indictment for confidence game as to name of party injured is not proved as laid.* Where an indictment for the confidence game alleges that the party from whom the money or property was obtained was Rapan Manian while the proof shows that the party's name was Rapan Mananianian there is a failure to prove a material allegation, as the name of the person whose property was obtained is an essential part of the description of the crime of obtaining property by means of the confidence game.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. ALBERT C. BARNES, Judge, presiding.

J. W. HALLAM, and GEORGE B. GILLESPIE, (THOMAS E. GILLESPIE, and GEORGE M. GILLESPIE, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, CLYDE C. FISHER, and ALVA L. BATES, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Thomas K. Novotny prosecutes this writ of error to procure the reversal of his conviction in the criminal court of Cook county of the crime of obtaining property by means of the confidence game, on account of errors occurring during the trial as well as the insufficiency of the evidence to support the verdict.

The testimony for the People tended to show these facts: The plaintiff in error was a volunteer Liberty bond salesman. In July, 1918, he was in the store of Wartun Margosian, in Chicago, and there met Rapan Mananianian, the prosecuting witness. Margosian told Novotny that Mananianian was his relative and came to see him because he was going into the army. Novotny asked if Mananianian was a citizen, and Mananianian told him no, and Novotny asked him if he wanted to go into the army, and he said yes, as he was drafted he had to go in Class 1. Novotny told him that if he didn't want to go he did not have to; that Novotny would help him out. He asked Mananianian if he bought Liberty bonds, and Mananianian said yes. Novotny then said, "Bring your Liberty bonds to me." Mananianian thereupon telephoned to a relative in Racine, Wisconsin, Edward Guranian, who came to Chicago with $300 of Liberty bonds and $200 or $300 in cash. He tes-

tified that he met Novotny with Mananianian and loaned the bonds and money to Mananianian in Margosian's shoe store. Mananianian introduced him to Novotny and they talked about the draft. Novotny said he was going to buy more Liberty bonds with the $200, and was going to show the government that Mananianian had $500 in Liberty bonds and was therefore not against the government; that he had a wife and family in Armenia and did not want to go because he was not a citizen. He said he was going to take the Liberty bonds to the draft board, and was going to show the government that this man was a friend and was going to take him out of the army. Mananianian had received his order of induction into the military service from Local Board No. 2 of the city of Racine, Wisconsin, with orders to report on July 24, 1918, for military duty. He testified that he went with Novotny and Guranian to the local board at Racine, and Novotny told Mananianian to stay outside while he went in. Novotny came out in about twenty minutes and said everything was all right, and they returned to Chicago. Novotny told Mananianian that he was free from the draft. Afterward Mananianian showed Novotny a letter which Mananianian could not read. Novotny again went to Racine before the local board, where he was gone about thirty minutes. When he came out he said he would have to go to Washington; that he needed money to pay the expenses. Mananianian then got the further sum of $199 from Guranian and gave it to Novotny, receiving a receipt stating that the amount was received on account of traveling expenses to Washington. After that Mananianian was arrested by the local board and was sent to Camp Taylor and he was in the service until after the armistice.

Mananianian, Margosian and Guranian were all Armenians. Mananianian had come to this country about eight years ago. He had a wife and family living in Turkey. His brother had been hanged for deserting from the Turk-

ish army. Novotny's defense was based upon his own testimony that he was employed by Mananianian to prevent his deportation; that Mananianian was afraid that he would be deported and would be executed by the Turkish government as his brother had been, and Novotny was employed to prevent his deportation; that Novotny said he would do the best he could for Mananianian and would go down and see Traeger, the president of the Illinois Western Security Company, by which Novotny was employed. Novotny testified that the next day he went to Racine and met Mananianian and Guranian there, and told them that if there was any way of helping Mananianian he would help him. He asked Guranian what was the matter with Mananianian, and Guranian said the police had got hold of Mananianian, and that they had hung his brother over there and he was afraid they would hang him if he went back. Novotny told them that Traeger said he would help Mananianian; that he had seen Traeger and that it would take some time; that Traeger did not want to array himself against the United States government, but he thought he could help Mananianian because he was acquainted in Washington, and Novotny said that he himself could help Mananianian with the local board in Chicago. They went back to Chicago, and Guranian gave Novotny the $300 in Liberty bonds and some money and Novotny presented the matter to Traeger again, who sent Novotny to see them again, with the message that Traeger wanted $199 for a trip to Washington, and they gave him the money, for which Novotny gave a personal receipt. Novotny took Mananianian to Racine, where Mananianian was present while Novotny talked to the local board. The matter was put over to such time as it could be arranged in Washington, and Mananianian went back to Chicago. Mananianian made a statement of what was wrong and they then went back to Racine, and the board there said the matter was being worked on by Traeger and the local board had the matter put over until August, when

Novotny and Mananianian went into the local board while it was in full session. The board heard Mananianian's statement, and said, "All right," and ordered him to Camp Taylor. He was not to be deported, they said, and would not have to drill but must put on a uniform. Traeger went to Washington, was gone a couple of days, and brought back a lawyer with him from Washington who helped Traeger to take care of the case. Novotny had a conversation with this lawyer about Mananianian's case, and he said they had gone through with it in Washington and Mananianian would not have to be deported but would have to go to camp and put on a uniform but would not have to drill.

Mananianian, Margosian and Guranian denied that anything was said about the deportation of Mananianian, and testified that they never heard of such a thing or that Novotny was employed for any other purpose than to get Mananianian relieved from military service. There was no evidence that any action had been taken or threatened for the deportation of Mananianian. Novotny knew nothing about any deportation proceedings. He stated in his testimony that the local board sent Mananianian a note stating that if he did not appear they would deport him because he was an alien, but he testified he did not see any record in regard to deportation proceedings and did not have anything to do with that, as that was not in his hands. The only statement he makes about it is that Andre, the Washington lawyer, said that they had gone through with the Mananianian case in Washington and Mananianian would not be deported.

The evidence for the People tends to show that Novotny procured the bonds and money of Mananianian on the pretense that they were to be used for the purpose of convincing the local board that Mananianian, being a purchaser of Liberty bonds, was a friend of the government and not hostile to the allies, and thereby procuring him to be relieved of liability to military service, and the evidence, if the jury

believed the version of the three Armenians rather than that of Novotny, was' sufficient to justify the verdict that the property was obtained by means of the confidence game.

On the trial the prosecution introduced evidence that in 1917, and later, Novotny had sold Liberty bonds to Margosian and collected sums of money in partial payment for them which he did not account for to Margosian, and that Margosian never received the bonds. There was evidence of a similar transaction with another Armenian, Vehan Paranian. These transactions were gone into in detail at the beginning of the trial in the examination of the first witnesses. They were not connected with the procuring of the bonds and money of Mananianian in any way. They were entirely separate transactions, and the court in the course of the trial, on motion of the plaintiff in error, held them incompetent and excluded them from the consideration of the jury. It is not competent upon the trial of a person charged with crime to prove he had been guilty of another independent crime. It is competent in prosecutions for obtaining money by means of the confidence game, and some other offenses, to prove other independent crimes of a similar nature for the purpose of showing the guilty knowledge or intention on the part of the defendant, and it is also competent to prove such crimes where they are a part of a series of transactions culminating in the commission of the crime which was the subject of the investigation, but this rule does not apply to this case. The transactions in regard to the purchase of the Liberty bonds were not of the character of crime with which plaintiff in error was charged. Those transactions, however dishonest they may have been on the part of the plaintiff in error, if they were criminal, would not constitute the crime of obtaining money by means of the confidence game. They were not similar in character to the offense charged in this case. They may have tended to show a dishonest disposition on the part of the plaintiff in error, but they had no tendency to show his

guilty knowledge or intention in regard to the transaction involved here, which was of an entirely different character. Neither did they constitute part of a series of transactions leading up to the commission of the crime charged in the present indictment. There is no reason to suppose that Novotny, at the time he sold the bonds to Margosian and Paranian, was laying the foundation for an attempt to swindle Mananianian or any other person. He did not know Mananianian and had never heard of him, and there is nothing in his transactions with Margosian or Paranian which could have a tendency toward the establishment of a confidence which would enable him later to get Mananianian's property. The court properly held the evidence incompetent and excluded it.

But it is insisted that the harm done the defendant by the introduction of the testimony could not be removed by its subsequent exclusion. It needs no argument to show the extremely prejudicial character of such testimony in the trial of a charge of this kind. The first evidence introduced tended to establish the character of the defendant as a dishonest man, who would be willing to commit the crime charged in the indictment, by showing that on two occasions he had been guilty of dishonest conduct in connection with the purchase of Liberty bonds. The court might instruct the jury to disregard the testimony, but such an instruction would not erase from the minds of the jury the fact, which was fixed by the testimony, of the supposed character of the man whom they were trying. It cannot be regarded as a fair trial where the prosecution has been permitted to blacken the character of the defendant before starting on an investigation of the crime with which he is charged, merely because afterward the jury were instructed that they should not pay any attention to that testimony. It is impossible to remove the impression so made from the mind so easily. Furthermore, in the argument of the State's attorney he referred to the plaintiff in error as a man who was prosti-

tuting the Liberty loan drive,—a matter which had nothing to do with the charge for which he was on trial and could have no purpose except to arouse the prejudice of the jury against the defendant, not by reason of the facts in the case on trial but by reason of other conduct.

We do not pass upon the credibility of witnesses, the weight of the evidence or the guilt of the plaintiff in error, but it is clear that his case was not fairly submitted to the jury. The admission of evidence in regard to the transactions concerning Liberty bonds, even though subsequently excluded, and the argument of the State's attorney on that question, were highly prejudicial to defendant. His whole defense depended upon the weight which the jury would give to his testimony, contradicted as he was by the witnesses for the People, and it was essential to a fair trial that in passing upon the question of his credibility, which was vital to his case, the jury should not be prejudiced by preliminary testimony that he had committed other crimes, that he was of a dishonest character, that he had failed to account for money of others which he had received, or that he had dishonestly failed to perform his contract.

The person whose money was charged to have been obtained was Rapan Manian, but the evidence showed his name to be Mananianian. In indictments for offenses against the persons or property of individuals the Christian and surnames of the parties injured must be stated if known, and the name stated must be either the real name of the party injured or that by which he is usually known; (*Aldrich* v. *People,* 225 Ill. 610; *Sykes* v. *People,* 132 id. 32; *Willis* v. *People,* 1 Scam. 399;) and it is essential that the name of the party injured should be proved as laid. There is no conflict of authority on this point. (*Davis* v. *People,* 19 Ill. 74; *Penrod* v. *People,* 89 id. 150; *McGary* v. *People,* 45 N. Y. 153.) The People's answer to this objection is, that when the evidence was introduced at the trial the plaintiff in error did not object to it and did not

point out any variance. The same question arose in *People* v. *Smith,* 258 Ill. 502, and it was held that the case presented not a question of variance but of failure of proof; that the indictment charged a crime against a certain person and the proof failed to show it, but did show the crime, if any, was against another person. While the offense of obtaining money by means of the confidence game is punished as a public crime, the particular offense charged is always the obtaining of the property of some individual, whose name therefore becomes material to the description of the offense as stated in the cases cited. Being a material averment it is necessary to be proved, and a failure to prove it is not a mere variance but a fatal lack of evidence to prove the crime charged. There is here no question of *idem sonans.*

In *People* v. *Weisman,* 296 Ill. 156, it is stated that the modern rule is that a variance as to names alleged in an indictment and proved by the evidence is not to be regarded as material unless it shall be made to appear to the court that the jury were misled by it or that some substantial injury was done to the accused thereby, such as that by reason thereof he was unable to intelligently make his defense or was exposed to the danger of a second trial on the same charge. In that case the indictment charged the name of the corporation injured to be First National Bank of Marissa, Illinois, while it was claimed the evidence showed the name to be First National Bank of Marissa. This was enough to establish the identity of the injured party as alleged in the indictment. But suppose the name had been alleged as the First National Bank, or the First National; would the case be the same, and could it be said that the defendant was not exposed to the danger of a second trial on the same charge? Would the production of the record showing an acquittal on this indictment for obtaining the property of Rapan Manian constitute a defense to another indictment for obtaining the property of Rapan Mananian-

ian? If it would, then an acquittal upon an indictment against Robert Brown would constitute a defense to a subsequent indictment of Robert Browning, and an acquittal of Thomas Buchan a defense to a subsequent indictment of Thomas Buchanan, or *vice versa.* The name of the person whose property was obtained being an essential part of the description of the crime of obtaining property by means of the confidence game, the failure to prove it beyond a reasonable doubt entitles the defendant to a verdict of not guilty.

The judgment will be reversed and the cause remanded for a new trial.

*Reversed and remanded.*