THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CECIL SCOTT FOSTER, Defendant-Appellant.

Fourth District No. 4—89—0958

Opinion filed July 5, 1990.—Rehearing denied August 3, 1990.

374

Michael J. Costello, of Immel, Zelle, Ogren, McClain & Costello, of Springfield, for appellant.

Alan D. Tucker, State's Attorney, of Havana (Kenneth R. Boyle, Robert J. Biderman, and Gwendolyn W. Klingler, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SPITZ delivered the opinion of the court:

This is an appeal by defendant Cecil Scott Foster, from the judgments of conviction entered in the circuit court of Mason County. Following a jury trial, defendant was found guilty of residential burglary and theft of property having a value in excess of $300 (Ill. Rev. Stat. 1987, ch. 38, pars. 19—3, 16—1). Defendant was sentenced to a term of imprisonment of 10 years for residential burglary and a term of imprisonment of four years for theft, the terms to be served concurrently. In addition, defendant was ordered to pay $1,225 restitution, plus court costs.

On appeal, defendant raises several issues. The facts relevant to each issue will be presented as the issues are analyzed.

■■ ■ The first issue to consider is whether the arrest warrant was issued without probable cause, requiring the suppression of defendant's statements subsequent to arrest. It is defendant's contention that since the arrest warrant was issued solely on information provided by a coconspirator, whom defendant characterized as a distraught witness complaining about her husband, there was no probable cause to issue the arrest warrant and, therefore, statements made by defendant following his arrest should have been suppressed. Section 107—9 of the Code of Criminal Procedure of 1963 (Code) states, in relevant part:

"(c) A warrant shall be issued by the court for the arrest of the person complained against if it appears from the contents of the complaint and the examination of the complainant or other witnesses, if any, that the person against whom the complaint was made has committed an offense." (Ill. Rev. Stat. 1987, ch. 38, par. 107—9(c).)

Under the fourth amendment to the Constitution of the United States and a similar provision in the Illinois Constitution, an arrest warrant may not issue without probable cause having been shown. (*Giordenello v. United States* (1958), 357 U.S. 480, 2 L. Ed. 2d 1503, 78 S. Ct. 1245; *People v. Ross* (1985), 132 Ill. App. 3d 553, 478 N.E.2d 27.) The existence of probable cause turns on the knowledge of the court and the officers at the time of the issuance of the warrant. If it appears from the totality of the circumstances and facts known to the court and officers, based on the information before the court at that time, that probable cause exists, unless such a finding is manifestly erroneous, a reviewing court will not overturn that finding of probable cause. A statement from a coconspirator implicating an accomplice may be sufficient to constitute probable cause for the issuance of an arrest warrant. A mere suspicion the defendant committed the of-

fense is not sufficient to support the issuance of an arrest warrant, but evidence sufficient to convict is not necessary. *Ross*, 132 Ill. App. 3d at 557, 478 N.E.2d at 30.

■ The arrest warrant issued on November 24, 1988. However, the record on appeal does not contain the affidavit in support of the request for issuance of the arrest warrant, or any bystander's report setting forth what information was provided to the judge prior to or at the time of the issuance of the arrest warrant. It is the obligation of defendant, as appellant, to have prepared and submitted to this court a record sufficient to allow the review of this issue. (*People v. Edwards* (1978), 74 Ill. 2d 1, 383 N.E.2d 944.) While this court is somewhat hindered by defendant's failure to submit a complete record, it is clear from the record before us that the defendant's "motion to suppress evidence and statements of defendant based on no probable cause and illegal arrest" was properly denied. Defendant's motion recites, "The arrest of Defendant without warrant was without probable cause, and absent exigent circumstances." Since it is obvious defendant was arrested pursuant to the issuance of an arrest warrant, the trial court properly denied defendant's motion.

The next issue presented for consideration is whether defendant's statements should have been suppressed because of violations of defendant's *Miranda* rights or, in the alternative, whether a statement of defendant should have been determined inadmissible because it alludes to offenses other than the offense for which defendant was being tried. The defendant raises three contentions. First, the defendant's right against self-incrimination has been violated by the officer's testimony referring to his silence during interrogation. Second, defendant argues the testimony should not have been allowed because of reference to other crimes. The third contention is that defendant's *Miranda* rights were violated by the officer's failure to discontinue the interrogation when defendant indicated he wanted to talk to his estranged wife before making a statement.

On direct examination, Chief Deputy Robert Huber of the Mason County sheriff's department testified concerning his observations of defendant while Deputy Leland F. Keith interrogated defendant. Huber testified:

"Sergeant Keith would ask Mr. Foster certain questions about involvement of the complaint that was attached to the warrant and I was more or less watching the reactions of his facial reaction and what have you whenever Sergeant Keith would ask him a question about this he would hang his head in an ashamed and forlorn manner."

Defense counsel asked that the answer be stricken and the trial court sustained the objection. After a conference at the bench, the jury was instructed to disregard Huber's characterization of an "ashamed or forlorn look." On cross-examination, defense counsel asked Huber if the witness thought it was fair for him to comment on the defendant's exercising his constitutional rights. The State objected and, after a conference at the bench, the question was withdrawn. Keith's testimony concerning one of the interviews was as follows:

"[Prosecutor]: When you returned did you commence your interview with Mr. Foster?

A. Yes, I did.

Q. At that time did you explain to him your theory of the Jeff Lynn burglary?

A. Yes, I explained to him the evidence we had, what I thought that it proved and explained that I believe in detail to him.

Q. What was his response?

A. During this Mr. Foster stared at the floor, clasped his hands, gave no real visible or verbal response to that. I asked something to the effect is that right or something, he didn't answer or didn't look up.

Q. Did you explain to him or did you provide your theory to him at that time as to other matters which were pending in your office?

A. Yes, I did.

Q. And what was his response in that regard?

A. In particular one response was that looking at the floor lifted his head, looked at me, said no way, I don't know nothing about it. Emphatic."

The defense made no objection to this testimony. The defendant was later asked on cross-examination by the prosecutor whether he denied to the police his involvement in the instant offense. During closing argument, the prosecutor made the following statement:

"You will recall that Keith testified when he returned he asked the Defendant about the burglary at Jeff Lynn's. He had the papers right there in front of him. You recall Keith's testimony as to his response. If you take that in to comparison what happened next, you will see how important that is. And next he asked him about various other matters he was concerned about. There was denial, vehement denial is what Deputy Keith testified to. Again I submit to you ladies and gentlemen that is not conduct one would expect in this particular instance."

Again, no objection was made by defendant.

In *People v. Herrett* (1990), 137 Ill. 2d 195, the Illinois Supreme Court decided that such error could be waived without invoking the plain error doctrine if it was not "of such magnitude as to clearly deprive the defendant of a fair trial." (*Herrett*, 137 Ill. 2d at 215.) However, in this case we deem that no waiver of the issue has occurred since defendant raised this issue before the trial judge on motion and the trial judge entered a ruling prior to trial. As a result, defendant's failure to object at trial does not constitute waiver.

The conversation about which the officers testified occurred while the defendant was in custody in Arizona. Defendant had been given his *Miranda* warnings. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) Defendant had signed a form waiving his *Miranda* rights. After indicating he understood his rights and that he intended to cooperate, he said he wanted to talk to his estranged wife, Judy.

Defendant does not argue Judy is an attorney and that such a request constitutes a request to consult with an attorney. Nor can he do so since such a person is not in a position to offer the legal assistance necessary for the protection of defendant's rights during interrogation. In *United States ex rel. Riley v. Franzen* (7th Cir. 1981), 653 F.2d 1153, *cert. denied* (1981), 454 U.S. 1067, 70 L. Ed. 2d 602, 102 S. Ct. 617, a 17-year-old defendant's request to talk to his father was construed as not invoking the right to assistance of counsel under *Miranda*. See also *Fare v. Michael C.* (1979), 442 U.S. 707, 61 L. Ed. 2d 197, 99 S. Ct. 2560 (request to talk to probation officer not a request for an attorney); *Chaney v. Wainwright* (5th Cir. 1977), 561 F.2d 1129 (request to call mother is not request for an attorney), *reh'g denied* (5th Cir. 1978), 570 F.2d 1391, *cert. denied* (1979), 443 U.S. 904, 61 L. Ed. 2d 871, 99 S. Ct. 3095.

The next question is whether such a request to talk to Judy before giving a statement is equivalent to an assertion of defendant's right to avoid self-incrimination by indicating an intention to terminate the interview. The parties have not cited any cases directly on point. Defendant relies on *People v. Davis* (1982), 105 Ill. App. 3d 549, 433 N.E.2d 1376, in which this court decided that when a defendant unaccompanied by a lawyer indicates, in any manner, a desire that the questioning cease, the questioning must cease. In *Davis*, the defendant refused to sign the *Miranda* waiver form and shook his head in a negative manner when the rights were read to him. This court found the trial court failed to consider the movement of defend-

ant's head in deciding whether defendant did not want to speak, did not understand his rights, or just what such conduct indicated. Therefore, the *Davis* court required a reconsideration of the motion to suppress.

Here, defendant indicated he would feel better if the State's Attorney would promise Judy would not get prison time. After Keith attempted to call the State's Attorney, failed to reach him, and indicated to defendant he would try again, the interview continued. The alternatives in this case are to accept defendant's interpretation that *Davis* applies here and the "statements" should be suppressed, or decide the condition placed on the giving of a statement was ambiguous and, therefore, did not invoke defendant's right to remain silent by requesting the interview cease immediately.

■ Defendant was questioned about several burglaries, some of which he denied involvement in. However, with regard to four others, defendant made no response except to look at the floor. This court deems the condition placed on the giving of the statement by defendant did not invoke the defendant's right to avoid self-incrimination by requiring the immediate cessation of the interrogation. Therefore, this court must decide whether the officers should be allowed to testify to what they observed. In this case, the "statement" of defendant is his behavior in answering some questions and not answering others.

Ordinarily, defendant's post-arrest silence is not inculpatory. (*People v. Deberry* (1977), 46 Ill. App. 3d 719, 361 N.E.2d 632.) But in this case, defendant was not completely silent. He chose to respond to some questions by denying involvement in some burglaries, while not responding to an inquiry about the burglary in the instant case. It is the officer's observation of defendant's behavior which was testified about, and the inference was left to the jury as to whether such behavior was evidence of an admission of guilt. There have been cases where prearrest silence may be indicative of guilt where the defendant remained silent under circumstances in which a reasonable person would ordinarily deny involvement. (See *People v. Aughinbaugh* (1967), 36 Ill. 2d 320, 223 N.E.2d 117.) However, in post-arrest situations, defendant has a right against self-incrimination which may not be infringed. The only question here is whether defendant's failure to remain completely silent so distinguishes this case as to allow the State to comment on defendant's behavior.

In *People v. Tate* (1978), 63 Ill. App. 3d 119, 379 N.E.2d 693, the defendant, after his arrest, offered a general denial of guilt and then refused to talk otherwise. Thereafter, the court decided that the prosecutor's attack on defendant's alibi testimony at trial by suggesting

defendant would have raised the alibi at the time of arrest had defendant been innocent, and that the alibi was recently fabricated, was an improper infringement on defendant's right against self-incrimination. Similarly, in *People v. Miles* (1980), 82 Ill. App. 3d 922, 403 N.E.2d 587, the defendant's failure to offer a self-defense explanation at the time of her arrest could not be commented upon by the State's witnesses or the prosecutor. In *Miles*, defendant had remained silent in the police car and for two hours thereafter. She later advised police of the threat to her by decedent. Both of these cases rely on *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, in which defendants remained silent after their arrest, but at trial testified they were "framed" by narcotics officers. In *Doyle*, the Court said the prosecutor could not comment about the failure of defendants to tell the "frame" stories at the time of arrest. In *People v. Chriswell* (1985), 133 Ill. App. 3d 458, 478 N.E.2d 1176, defendant indicated to police a willingness to discuss the subject of his alleged sale of an automobile observed near the scene of a burglary and provided details such as when sold, that it was a cash sale, that he could not remember to whom it was sold, and he thought he had transferred the plates on the car, but he was silent when confronted with the fact that the registration was still in his name. The court held the refusal to answer one question is not a sufficient expression of a desire to remain silent as would invoke fifth amendment protection. Relied on in *Chriswell* are *People v. Rickard* (1981), 99 Ill. App. 3d 914, 917, 425 N.E.2d 1317, 1319 (defendant stating, "I won't tell you," in response to two questions did not invoke right against self-incrimination), and *People v. Trumbull* (1978), 67 Ill. App. 3d 262, 384 N.E.2d 842 (where defendant made an exculpatory statement, but failed to include a self-defense about which he later testified). *Chriswell* distinguishes *Doyle*, discussing the cross-examination of defendant's alibi testimony at trial as follows:

> "The rule established in *Doyle* does not apply to cross-examination relating to prior inconsistent statements. (*Anderson v. Charles* (1980), 447 U.S. 404, 408, 65 L. Ed. 2d 222, 226, 100 S. Ct. 2180, 2182; *People v. Rehbein* (1978), 74 Ill. 2d 435, 443, 386 N.E.2d 39, 42-43; *In re S.L.C.* (1979), 75 Ill. App. 3d 473, 476, 394 N.E.2d 687, 689; *People v. Eubanks* (1977), 55 Ill. App. 3d 492, 495, 371 N.E.2d 92, 94.) The reason for this exception is that '[s]uch questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has

not remained silent at all.' *Anderson v. Charles* (1980), 447 U.S. 404, 408, 65 L. Ed. 2d 222, 226, 100 S. Ct. 2180, 2182." *Chriswell*, 133 Ill. App. 3d at 464, 478 N.E.2d at 1181.

From an analysis of these cases, it is clear that under the circumstances of this case mere silence by an accused does not invoke defendant's right to avoid self-incrimination by terminating the post-arrest interview. On the other hand, more than a subjective belief by the interviewing officers must be present for the defendant's behavior to rise to the level of evidence of a communication admissible at trial. Factors which should be considered by the trial court with regard to the admissibility of such evidence include (1) whether the accused was given his *Miranda* rights; (2) whether the accused knowingly, voluntarily, and understandingly waived his *Miranda* rights, and did not effectively reassert his constitutional rights at any time prior to the observed behavior; (3) whether the accused exhibited such a mode or pattern of behavior that a person observing the behavior would reasonably believe the behavior was a form of communication; and (4) whether the interviewing officers reasonably believed the behavior was communicative in nature. The officers may not, however, testify as to what they believed the accused's behavior communicated to them, for such inferences are matters to be decided by the jury. Of course, once the officers testify as to defendant's behavior, the defendant may deny that he intended any admission of guilt by such behavior.

All of the factors recited above are present in this case. As a result, the trial court properly allowed the evidence to go before the jury. It was also quite appropriate for the trial court to order the State to condition the testimony concerning questioning of other burglaries on not identifying the victims of the other burglaries and on not implying that defendant was suspected of committing the other burglaries.

Having found the "statements" are admissible and after rejecting defendant's argument concerning the right against self-incrimination, this court finds the defendant's final argument to be unpersuasive as well. Defendant cites several cases in which it has been decided that evidence of defendant's commission of other crimes may not be introduced into evidence merely to show criminal tendency or disposition because of the prejudicial effect such evidence would have. (*People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506; *People v. Novotny* (1922), 305 Ill. 549, 137 N.E. 394.) However, such is simply not the case here.

The trial testimony of the officers does not in any way indi-

cate defendant's commission of other crimes. On the contrary, the testimony emphasizes defendant's denial of involvement in burglaries other than the one for which he is being tried.

The next issue to consider is whether the statement of a coconspirator implicating defendant was inadmissible. The statements referred to by Teresa Langley during her testimony were statements made to her by her husband, Tracy. According to Teresa, Tracy advised her she was an accomplice and that she would not tell anyone and he told her to remove the stupid look from her face. These statements occurred immediately following the transaction for which defendant was being tried.

The defendant contends such statements were improperly admitted into evidence by the trial court on the theory the testimony refers to a statement by a coconspirator because there is no independent showing of a conspiracy and the statements were not made in furtherance of the conspiracy. The State admits the coconspirator exception to the hearsay rule does not apply here since the statements do not implicate defendant in the offense, but the State argues defendant was not prejudiced by this testimony.

■■■ Without conceding that error occurred, even assuming for the sake of argument that defendant is correct in asserting the evidence should not have been admitted, any such arguable error must be harmless beyond a reasonable doubt. As will be noted later, defendant's involvement in the offense is established by Teresa Langley's testimony. The evidence of defendant's guilt is overwhelming, and the evidence complained of here neither adds to nor detracts from the evidence of defendant's guilt. Had this testimony not been in evidence, the result would have been no different.

■■■ Moreover, this court could find the absence of any error at all. In *People v. Davis* (1970), 46 Ill. 2d 554, 558-59, 264 N.E.2d 140, 142-43, the Illinois Supreme Court discussed the coconspirator exception to the hearsay rule as follows:

> "As explained by the United States Supreme Court in *Lutwak v. United States*, 344 U.S. 604, 617, 97 L. Ed 593, 603, 73 S. Ct. 481, 489: 'Declarations of one conspirator may be used against the other conspirator not present on the theory that the declarant is the agent of the other, and the admissions of one are admissible against both under a standard exception to the hearsay rule applicable to the statements of a party. *Clune v. United States*, 159 U.S. 590, 593, 16 S. Ct. 125, 126, 40 L. Ed. 269. See *United States v. Gooding*, 12 Wheat. 460, 468-470, 6 L. Ed. 693. But such declaration can be used against the

co-conspirator only when made in furtherance of the conspiracy. *Fiswick v. United States*, 329 U.S. 211, 217, 67 S. Ct. 224, 227, 91 L. Ed. 196; *Logan v. United States*, 144 U.S. 263, 308-309, 12 S. Ct. 617, 631-632, 36 L. Ed. 429.' (Accord, *People v. Parson*, 27 Ill. 2d 263, 267; *People v. Grilec*, 2 Ill. 2d 538; *Spies v. People*, 122 Ill. 1; *Samples v. People*, 121 Ill. 547.) In the case of admission of a co-conspirator's statement made in the furtherance of the conspiracy, the hearsay rule is satisfied since defendant does have the opportunity to confront and cross-examine the witness who alleges that the statement was made. (See *People v. Carpenter*, 28 Ill. 2d 116, 120-22.) The statement to which Davis takes exception was admissible against him as an exception to the hearsay rule, and was thus neither within the literal prohibition of *Bruton* nor within its rationale. (*McGregor v. United States* (5th cir., 1970), 422 F.2d 925, *Kay v. United States* (9th cir., 1970), 421 F.2d 1007; *Reyes v. United States* (9th cir., 1969), 417 F.2d 916; *Campbell v. United States* (6th cir., 1969), 415 F.2d 356; \*\*\* *contra*, *United States v. Guajardo-Melendez* (7th cir., 1968), 401 F.2d 35.[)] The absence of a conspiracy charge does not affect the admissibility of such testimony. *People v. Parson*, 27 Ill. 2d 263; *Kay v. United States*, 421 F.2d 1007, 1010.''

The implication of the statement made by Tracy Langley was that Teresa had been placed in a position such that she could not inform on defendant and Tracy without implicating herself in the criminal activity. There could be a reasonable inference that defendant and Tracy Langley got Teresa involved in the burglary so as to prevent her informing on them. Clearly, such a statement is made in furtherance of the conspiracy. Even though the isolated statements do not appear to inculpate defendant, they do, however, inculpate defendant where made in defendant's presence under the circumstances testified to by Teresa Langley.

■ Next, we consider whether defendant was denied due process by the refusal of the trial court to conduct an evidentiary hearing on defendant's motion to quash the search warrant and to suppress evidence. On September 21, 1989, defendant filed a motion to quash search warrant and to suppress evidence illegally seized with regard to a warrant issued on November 25, 1988, for a search of Helen's Place in Easton, Illinois. Defendant's motion alleged that the warrant was insufficient on its face and violated his fourth amendment rights in not showing sufficient probable cause to issue the warrant, that it was based on hearsay, and that the persons, location, and items were

not indicated with adequate specificity. The State responded by filing a motion to dismiss. After hearing arguments of counsel, the trial court dismissed defendant's motion to quash.

From a review of the record, it is clear there was no evidence which resulted from this search which was presented at defendant's trial. As a result, it is unnecessary to review this issue or to extensively discuss the law relevant to when a trial court should give a hearing on a motion to quash a search warrant or to suppress evidence.

Furthermore, even if there had been evidence which resulted from the search pursuant to the challenged warrant, it is obvious the trial judge did not commit an abuse of discretion by granting the motion to dismiss defendant's motion to quash. Defendant's motion is not supported by affidavit. Nor does defendant's motion allege that the affidavit of Keith in support of the request for the search warrant knowingly and intentionally, or with reckless disregard, included a false statement. Under these circumstances, the trial court properly dismissed the motion to quash the search warrant. See *People v. Lucente* (1987), 116 Ill. 2d 133, 506 N.E.2d 1269.

■ Whether the trial court erred in refusing to give defendant's tendered non-Illinois Pattern Jury Instructions Nos. 2, 3, 4, and 5 is the next issue to be addressed. Defendant claims as error the refusal of the trial court to give defendant's tendered instruction Nos. 2 through 5. The refused instructions read as follows. Defendant's tendered instruction No. 2:

> "Defendant's mere presence in and around the scene of the crime is not culpable, and even consent or knowledge on his part that the crime is being committed does not constitute aiding or abetting."

Defendant's tendered instruction No. 3:

> "The mere association of the defendant with others does not establish criminal responsibility in and of itself."

Defendant's tendered instruction No. 4:

> "If you find from the evidence that any witness for the prosecution has been promised immunity by any representative of the prosecution, or if you find that he has been promised any other reward for testifying in this case, you are entitled to consider those circumstances in weighing his credibility and truthfulness as a witness. In the same manner, you may consider any reward or advantage dependent upon his testimony which you find that the witness has anticipated or hoped for."

Defendant's tendered instruction No. 5:

"In weighing and considering the credibility of witnesses, the jury should consider whether \*\*\* any witness has become interested or hopes to receive any reward, immunity or benefit from the prosecution of the case, or has in any other way become interested or had his feelings or passions enlisted against the defendants and if the jury shall find any such witness has sustained or does sustain such relation in the case as would naturally tend to interest him, then it is the duty of the jury to consider whether such feelings of interest of such witness has had any effect upon such of his testimony as is material to the issues of the case."

None of the above instructions were based on the Illinois Pattern Jury Instructions, Criminal (2d ed. 1981) (IPI Criminal 2d). The trial court gave defendant's tendered instruction No. 8, which was based on IPI Criminal 2d No. 3.17, and which states:

"When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

Defendant argues that there should be an instruction relative to the credibility of a witness who has been granted immunity. Defendant also argues he is entitled to these instructions because a jury should be instructed as to defendant's theory of the case even if the evidence in support of that theory is slight. (*People v. Stamps* (1982), 108 Ill. App. 3d 280, 438 N.E.2d 1282.) However, as *Stamps* points out, the decision to give non-IPI instructions rests with the sound discretion of the trial court. Unless the IPI criminal instructions applicable to the case fail to accurately state the law, the IPI criminal instructions are to be given. (107 Ill. 2d R. 451.) Also given was State's instruction No. 2 (see IPI Criminal 2d No. 1.02):

"You are the sole judges of the credibility of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his or her ability and opportunity to observe, his or her memory, his or her manner while testifying, any interest, bias, or prejudice he or she may have, and the reasonableness of his or her testimony considered in the light of all the evidence in the case.

You should judge the testimony of the Defendant in the same manner as you judge the testimony of any other witness."

The jury was also instructed concerning the State's burden of proving defendant guilty beyond a reasonable doubt (IPI Criminal 2d No. 2.03) and as to the element of each offense which must be proved beyond a reasonable doubt (IPI Criminal 2d No. 13.02A; IPI Criminal 2d No. 14.10 (Supp. 1989)).

The jury was appropriately instructed under Illinois law. No abuse of discretion was committed by the trial court's refusing the defendant's tendered instructions Nos. 2 through 5.

■■■ Defendant next asks this court to consider whether defendant was proved guilty beyond a reasonable doubt. Under the decision of *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781, in determining whether the elements of the charged offenses have been proved beyond a reasonable doubt, the reviewing court need only examine the record, viewing the evidence in the light most favorable to the prosecution, with the objective of deciding whether any rational trier of fact could have found the essential elements of the offense to have been proved beyond a reasonable doubt. Every reasonable hypothesis of innocence need not be excluded to sustain conviction. It is the function of the trier of fact to weigh the credibility of witnesses and to resolve conflicts or inconsistencies in the testimony, and the reviewing court will not retry the defendant. See *People v. Eyler* (1989), 133 Ill. 2d 173, 549 N.E.2d 268.

Defendant challenges the sufficiency of proof as to both convictions. He argues he was not proved guilty beyond a reasonable doubt of residential burglary because the conviction is based on the admission to police officers during interrogation, their observations of him crying during a conversation, and the testimony of Teresa Langley, who was granted immunity and who had a motive to testify falsely because she and her husband had divorced. As to the theft conviction, defendant contends the evidence is insufficient to prove the value of the property exceeds $300 and, therefore, he should be sentenced as on a Class A misdemeanor. Compare Ill. Rev. Stat. 1987, ch. 38, par. 16—1(b)(1), to subparagraph (b)(4).

In *People v. Krankel* (1985), 131 Ill. App. 3d 887, 476 N.E.2d 777, this court decided a conviction may be based on the uncorroborated testimony of an accomplice-wife who, at the time of the crime, was seeking dissolution of her marriage to defendant. Since these matters were before the jury, the jury, as trier of fact, is to assess the credibility of the accomplice and the weight to be accorded such testimony.

■■■ A conviction for residential burglary requires proof beyond a reasonable doubt that defendant knowingly and without authority entered the dwelling place of another with the intent to commit therein

a felony or theft. (Ill. Rev. Stat. 1987, ch. 38, par. 19—3.) Defendant argues there was no evidence of intent to commit a theft in the Lynn residence. Such intent, however, may be established by inference from the surrounding circumstances, such as breaking and entering into a building where a theft could occur. (*People v. Lobdell* (1988), 172 Ill. App. 3d 26, 525 N.E.2d 963, *appeal denied* (1988), 122 Ill. 2d 586, 530 N.E.2d 257.) In this case, the evidence supports defendant's conviction for residential burglary.

At the trial, Jeffrey Lynn testified he lived in a single mobile home in rural Mason County, near Easton, Illinois. He lived alone. On April 10, 1988, he went to Easton, at approximately 7:30 to 8 p.m., to Helen's Place. Defendant and Tracy Langley were at the tavern, but he could not remember whether Teresa Langley was there. The bartenders were Judy Foster and Shirley Barton. He later corrected his testimony to state he arrived between 8 and 8:30 p.m. He stayed until 9:30 p.m., then went across the street to visit some friends for approximately an hour, came back to Helen's Place, and stayed until roughly 11:30 p.m. When he left, he did not go directly home, but arrived at his trailer at 1:30 a.m. When he arrived home, he noticed a drawer in the nightstand by the bed was open, and a few boxes he kept in the drawer were on top of the nightstand. He put the boxes back in the drawer and went to sleep. When he woke up, he began to check to see if anything else was unusual. In the living area, his television was still standing on the stand. He noticed his Pioneer videocassette recorder (VCR) was missing. He found the remote control unit to the VCR. A small portable AM-FM radio with cassette player, a Canon 35 millimeter camera, and the remote control to the television were also missing. Change in a glass container and a gold ring in a jewelry box were missing. After he called the sheriff, he noticed a couple of marks at the door frame where an object had scratched it. The remote control to his television had his name engraved on the back, along with his social security and license numbers. The stolen remote control had a battery cover that would always come off. It would just pop off. It came unglued. Lynn identified a remote control with an unglued plate. It looked just like the one he had possessed. He identified a lens-cover cap for a Canon camera. A television set was brought in, and the remote control operated the television.

Lynn testified that no one had authority to enter his trailer and that the value of the items of property that were stolen was approximately $1,200. He stated his nickname was "Peanut." On the night of the crime he spoke to Tracy Langley while he was in the tavern. The remote control and lens cap looked like his. When the VCR was

stolen, he recalled he might have had a tape containing "Night Court," "Cheers," and "L.A. Law," in the VCR. The VCR had a serial number. The camera did not. When he left home the night of the crime, he left an outside light on and had a timer for a light inside the living room. He testified that the television used in court was his television, and his name was inscribed on the back. Judy Foster, who was tending bar, is the wife of the defendant. When he left the tavern initially for an hour and came back in, it was about 10:30 p.m. Tracy Langley was there the entire time Lynn remained there. He cannot recall if he saw defendant after he returned.

Teresa Langley testified she lives in Mason City, Illinois, and is divorced from Tracy Langley. They were married 2½ years and had two children. Tracy Langley is the defendant's stepson. Teresa is 23 years old. During the marriage, she saw the defendant every weekend at the tavern. She never had any arguments or disagreements with the defendant. During the summer of 1987, she met with Mason City police officers. They had talked to her father and they wanted to question her husband. On April 10, 1988, she was at Helen's Place. She arrived there between 7 and 7:30 p.m. with her husband. The defendant was upstairs watching television when they arrived. There is an apartment upstairs, and Judy and Scott Foster lived there. She could not recall what she was drinking that evening. The defendant and Tracy came downstairs and told her to "Come on." They told her to wait until they left, and after they went out the back door, she did also. The defendant was driving Judy's car and Tracy was in the back. She got in next to the defendant, and the defendant told her to drive. She asked where they were going, and the defendant said, "On a run to Peanut's." She knew what "a run" meant. They were going to steal from someone's house. While she was driving, the defendant sat in the passenger side next to her. Her husband had on a navy-blue sweat jacket, with a "Cami" vest and dark jeans. The defendant had on a "Cami" sweatshirt and a blue jacket vest. They both had gloves on. They were the winter kind, with leather-like palms. The back was cotton and the palm was smooth. The defendant told her the directions—she was driving slowly, and then she saw a trailer with a light. The defendant said to go slow by it and let him and Tracy out. She knew "Peanut" to be a guy with red hair that she had seen in the tavern that evening. She slowed down and they told her to come back and get them in 20 minutes. She was told to go into town and get a Pepsi. Foster and Langley both got out and ran across the road toward the trailer. They were crouched down. She drove to Kilbourne, went to a tavern, got a Pepsi, and was back in 20 minutes. There was

a clock in the car so she could tell the time. She picked them up at about the same place she dropped them off. The defendant got back in next to her, carrying a stereo in his arms, and Tracy got in the back seat, carrying a VCR. They went back to the tavern. On the way back, she made the comment that she could not believe what she was doing, that she was doing this, and her husband told her that she was now an accomplice. He told her she would not tell anybody. The defendant was in the car when her husband made that comment. He was sitting next to her. They were gone from the tavern for about an hour. When they arrived back, defendant got out and headed toward the back of the tavern to go upstairs with the stereo, and Tracy put the VCR in the back of the Blazer and covered it up. She went back in and sat down, and was sitting as before. She saw Tracy the rest of the evening, and defendant would occasionally come down and get a Pepsi.

Tracy walked over to Peanut and began talking to him. Later, Tracy told her to knock the stupid look off her face, because she was dumbstruck by Tracy's behavior. She and her husband stayed until the tavern closed, then they went home. She took the baby-sitter home and, when she returned, Tracy was playing a tape on the VCR; he handed her a remote control, telling her he got the wrong one. The tape went through "Jeopardy," "Cheers," "Night Court" and "L.A. Law." They did not own a VCR or a tape prior to that. Examining the remote control, she stated that Tracy handed it to her and she put it on the nightstand. It stayed in their house a long time, until the middle of August 1988. At that time, Tracy asked her about the stuff, and she said she hid it so no one could find it. He stated if he did not get the stuff, something would happen. So she gathered the stuff up and gave it to her mother. She gave her enough information, but not enough that she would be involved. The next time she saw the remote control was in November when Deputy Keith came to talk to her. She identified the lens cap that Tracy took off the camera while he was using it, and left on the dresser. She hid it so no one could find it. She saw the camera the next day. Tracy said he was going to take it back to the tavern so they could stick it in "the hole." They had a place to secrete the stolen property. The VCR remained at her house until defendant came for it. He said Tracy told him to sell it, and he had a buyer for it in Havana. This was August 20, 1988. She saw Keith November 21, 1988. The meeting came about because her mother was upset with Tracy and had gone to the police. The witness' mother was upset because Tracy had taken a horse.

When Keith arrived at her house, she was quiet and scared. She

gave him some information, but was afraid because she would get in trouble, too. She did not show him the lens cover or the remote control. After Keith said there was a possibility she would not be charged, she agreed to turn over the items. Her mother retrieved the items and gave them to Keith. After she was given immunity, she gave a full statement. She did not see Tracy or defendant enter the trailer. She considered defendant her friend.

On cross-examination, she testified the day her mother called the police, she and her husband separated. Her ex-husband is charged with this crime based on her information. In her statement, she did not advise Keith that Tracy told her to shut up and that she is an accomplice. She was afraid to tell the police. She did not tell them, even though she was free, because she was still scared. Her testimony that they said, "You are in it," is not contained in her statement to Keith. She thought she had told the police that and it was in the statement. She told them everything she could remember. The subject of immunity came up when Keith told her he could get her immunity. She and her husband originally got to the tavern about 7:30 p.m. and stayed about an hour. When they left, it was 8:20 p.m. They were gone about an hour. She recalled drinking a Diet Pepsi while driving down the road in the car with defendant and her husband, around 8:30 p.m. When they came back, defendant went upstairs with the television set. He did not have to go through the tavern. When she returned to the tavern, she saw Peanut at the end of the bar. It was then between 9:30 and 9:45 p.m.

Defendant denied involvement in the incident. Nevertheless, there is sufficient evidence to conclude defendant was proved guilty of residential burglary beyond a reasonable doubt.

 With regard to whether defendant was proved guilty of theft of property having a value over $300 beyond a reasonable doubt, the value of the property stolen, although not a material element of the offense of theft, must be found by the jury in order that defendant may be properly sentenced. (*People v. Jackson* (1984), 99 Ill. 2d 476, 459 N.E.2d 1362.) The elements necessary to be proved to establish the offense of theft are discussed in *People v. Richardson* (1988), 169 Ill. App. 3d 781, 783, 523 N.E.2d 1128, 1129. Regarding the theft conviction, defendant's only contention is that the State's proof did not sufficiently establish the market value at the time and place of the offense. In *People v. Moore* (1982), 109 Ill. App. 3d 874, 441 N.E.2d 409, relied on by defendant, the witness' testimony of the cost of the stolen items was equivocal. She "thought" the price of the speakers was $300 and she "guessed" the portable television cost about $160

to $165. Such equivocation is not present in this case. The victim testified that the total value of the Pioneer VCR, money, Canon 35 millimeter camera, portable radio with cassette player, gold ring, and the remote control device to a Magnavox television totalled approximately $1,200.

■■ Moreover, the State properly established value in the case at bar. As was stated in *People v. Langston* (1981), 96 Ill. App. 3d 48, 54, 420 N.E.2d 1090, 1094:

> "Original or replacement cost is not the standard for assessing value, although evidence of cost together with evidence concerning age, condition, and utility of the stolen item may afford a basis for determining value. (*People v. Brown* [(1976), 36 Ill. App. 3d 416, 343 N.E.2d 700].) A consumer who is familiar with the stolen property or property of a similar nature is competent to testify as to the property's value. While it is true that a consumer would have less experience in valuing property than one engaged in the business of buying or selling such property, the inexperience associated with consumer status goes toward the weight of the evidence, not its competency. (*People v. Songer* (1977), 48 Ill. App. 3d 743, 362 N.E.2d 1127.) As with other elements of an offense, the burden of proof beyond a reasonable doubt applies to the valuation of property. *People v. Scott* (1978), 59 Ill. App. 3d 864, 376 N.E.2d 375; *People v. Newton* [(1969), 117 Ill. App. 2d 232, 254 N.E.2d 165]."

As a result, defendant has been proved guilty of felony theft beyond a reasonable doubt.

Defendant could have cross-examined Lynn regarding the bases for his valuation testimony. Of course, defense counsel probably made a tactical decision not to do so in order to avoid the possibility this witness had been well prepared for such an eventuality.

The remaining issues concern defendant's sentences. Defendant asks this court to consider whether defendant received grossly disparate sentences as compared to a defendant similarly situated. Defendant asks this court to compare the sentences imposed on him with those imposed on Tracy Langley. Langley was convicted of burglary and theft and was sentenced to six months' home confinement, subject to work release. Defendant argues his sentence is unduly disparate, even though defendant's reply brief concedes that disparate sentences are not *per se* improper. *People v. McClendon* (1986), 146 Ill. App. 3d 1004, 497 N.E.2d 849.

■■■ Sentencing rests in the sound discretion of the trial court, and in the absence of an abuse of discretion, the trial court's decision

will not be reversed on appeal. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) While defendants similarly situated should not receive grossly disparate sentences, equity in sentencing is not required for all participants in the same crime. (*People v. Godinez* (1982), 91 Ill. 2d 47, 434 N.E.2d 1121; *People v. Patterson* (1981), 100 Ill. App. 3d 207, 426 N.E.2d 978.) The difference may be justified by the relative character and history of the codefendants, the degree of culpability (*Patterson*, 100 Ill. App. 3d at 212, 426 N.E.2d at 982), rehabilitative potential, or a more serious criminal record. (*People v. Wolfe* (1987), 156 Ill. App. 3d 1023, 510 N.E.2d 145.) Nor is disparity between the sentences of a defendant who pleaded guilty and one who chose to go to trial automatically suspect (*People v. Coustin* (1988), 174 Ill. App. 3d 824, 529 N.E.2d 89), for a trial court may properly grant leniency to the defendant who pleads guilty and thereby insures prompt and certain application of correctional measures, acknowledges his guilt, and demonstrates a willingness to assume responsibility for his conduct. (*McClendon*, 146 Ill. App. 3d at 1013, 497 N.E.2d at 855.) In short, it is not the fact of disparity which controls, but the reason for the disparity. *Coustin*, 174 Ill. App. 3d at 827, 529 N.E.2d at 91.

In this case, the two defendants are not similarly situated since one defendant was convicted of burglary (Langley) and one defendant was convicted of residential burglary. The permissible sentences for the two offenses are quite different. (Ill. Rev. Stat. 1987, ch. 38, pars. 19—1(b), 19—3(b), 1005—8—1(a)(4), (a)(5).) Moreover, although the record in this case has now been supplemented to include the order sentencing Langley, the record does not include a transcript of Langley's sentencing hearing or a copy of the presentence report or other documents in the Langley record which the sentencing judge would have relied upon to sentence Langley. As a result, this court cannot compare the reasons underlying Langley's sentence with the reasons for defendant's sentence. The record not being sufficient for a review of this issue, the court is unable to consider the issue. As noted earlier, it is appellant's duty to provide a complete record on appeal, and doubts arising from incompleteness of the record are resolved against appellant. *Teitelbaum v. Reliable Welding Co.* (1982), 106 Ill. App. 3d 651, 435 N.E.2d 852.

The final issue to consider is whether the sentences imposed were excessive and constituted cruel and unusual punishment. With regard to this issue, defendant's contentions are two. First, he argues the sentences imposed are excessive. Second, he argues, without citing any authority in support of his argument, that the nonprobationary

nature of the offense of residential burglary renders the residential burglary statute violative of the eighth amendment, which prohibits cruel and unusual punishment.

Since the supreme court rule requires defendant to cite appropriate legal authority supporting his argument (107 Ill. 2d R. 341(e)(7), this court declines to consider the question of whether the nonprobationable provision on residential burglary (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3(c)(2)(G)) renders the statute violative of the eighth amendment proscription against cruel and unusual punishment. (U.S. Const., amend. VIII.) As this court commented in *Loitz v. Remington Arms Co.* (1988), 177 Ill. App. 3d 1034, 1059, 532 N.E.2d 1091, 1106, a mere statement of such a challenge does not require this court to raise such a statement to the level of a constitutional argument. After all, the provision is presumed valid, and the defendant has the burden of rebutting the presumption. (*People v. Oestringer* (1974), 24 Ill. App. 3d 185, 321 N.E.2d 146.) In any event, under the facts of this case, such an analysis is unnecessary since the sentences applied to defendant are not cruel and unusual punishment, and it seems defendant is not a candidate for probation anyway.

Defendant's sentences are within the statutory limits for such offenses. (Ill. Rev. Stat. 1987, ch. 38, pars. 16—1(b)(4), 19—3(b), 1005—8—1(a)(4), (a)(6).) Even though the sentence is within the statutory limits, an abuse of sentencing discretion may be found if there is an affirmative showing the sentence varies greatly from the purpose and spirit of the law or the sentence is manifestly violative of constitutional guidelines. *People v. Smith* (1988), 172 Ill. App. 3d 94, 526 N.E.2d 849.

In sentencing the defendant, the trial court considered the statutory factors in aggravation and mitigation. (Ill. Rev. Stat. 1987, ch. 38, pars. 1005—5—3.1, 1005—5—3.2.) He specifically found the absence of any substantial grounds which, though not sufficient to formulate a defense, tended to excuse or justify defendant's conduct. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.1(a)(4).) The trial court also found the crime was not induced or facilitated by someone other than defendant. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.1(a)(5).) The trial court found that statements of defendant reported in the presentence report showed an absence of a penitent attitude, or a lack of remorse, and this reflected on defendant's potential for rehabilitation. The defendant made a statement to the probation officer that he would like to talk to Teresa Langley and would like to have killed her a long time ago. Defendant also stated to a Mason County jailor that, "It's over now, hunh [*sic*], yeah, I did the crime and now I have to do

the time." Defendant was found not to be a person lacking in maturity and intelligence and, as a former law-enforcement officer, he is cognizant of the consequences of his criminal activity. The trial judge commented that persons in our society should not have to be concerned about having their homes burglarized when they leave them. As a result, the trial judge found that a substantial sentence is necessary to deter others from committing the same crime and that a lesser sentence would deprecate the seriousness of defendant's conduct and be inconsistent with justice. Although several witnesses testified for defendant at the sentencing hearing and spoke very highly concerning defendant's reputation, the trial court specifically found that such testimony was inconsistent with what the judge believed defendant's character to be.

 It does not appear the sentence imposed by the trial court resulted from an abuse of discretion. For this reason and for all the foregoing reasons, the judgment of the circuit court of Mason County is affirmed.

Affirmed.

KNECHT, P.J., and STEIGMANN, J., concur.